# EXHIBIT A

# Complaint

# EXHIBIT A

Electronically Filed
9/30/2019 1:30 PM
Steven D. Grierson
CLERK OF THE COURT

**COMPJD**
KATHLEEN J. ENGLAND, ESQ.
Nevada Bar No. 206
**GILBERT & ENGLAND LAW FIRM**
610 South Ninth Street
Las Vegas, Nevada 89101
Telephone:   702.529.2311
E-mail:        kengland@gilbertenglandlaw.com

JASON R. MAIER, ESQ.
Nevada Bar No. 8557
JOSEPH A. GUTIERREZ, ESQ.
Nevada Bar No. 9046
DANIELLE J. BARRAZA, ESQ.
Nevada Bar No. 13822
**MAIER GUTIERREZ & ASSOCIATES**
8816 Spanish Ridge Avenue
Las Vegas, Nevada 89148
Telephone: 702.629.7900
Facsimile:  702.629.7925
E-mail:       jrm@mgalaw.com
                  jag@mgalaw.com
                  djb@mgalaw.com

*Attorneys for Plaintiffs Judy Doe No. 1,*
*Judy Doe No. 2, Judy Doe No. 3, Judy*
*Doe No. 4, Judy Doe No. 5, Judy Doe*
*No. 6, Judy Doe No. 7, Judy Doe No. 8*
*and Judy Doe No. 9*

CASE NO: A-19-802786-C
Department 20

## EIGHTH JUDICIAL DISTRICT COURT

## CLARK COUNTY, NEVADA

JUDY DOE NO. 1, an individual; JUDY DOE
NO. 2, an individual; JUDY DOE NO. 3, an
individual; JUDY DOE NO. 4, an individual;
JANE DOE NO. 5, an individual; JUDY DOE
NO. 6, an individual; JUDY DOE NO. 7, an
individual; JUDY DOE NO. 8, an individual;
and JUDY DOE NO. 9, an individual

                          Plaintiff,

vs.

WYNN RESORTS, LIMITED, a Nevada
corporation; WYNN LAS VEGAS, LLC, a
Nevada limited-liability company; DOES I

Case No.:
Dept. No.:

**COMPLAINT FOR DISCRIMINATION,
RETALIATION AND RELATED TORTS**

**DEMAND FOR JURY TRIAL**

**Arbitration Exemption:**
  1. **Damages in excess of $50,000**
  2. **Equitable Relief Requested**

1

through X; and ROE CORPORATIONS I through X, inclusive,

Defendants.

Plaintiffs Judy Doe No. 1; Judy Doe No. 2; Judy Doe No. 3; Judy Doe No. 4; Judy Doe No. 5; Judy Doe No. 6; Judy Doe No. 7; Judy Doe No. 8; and Judy Doe No. 9, whose identities are known to Defendants but are being withheld from public disclosure in this Complaint at this time due to privacy and safety concerns, by and through their attorneys, the law firms of GILBERT & ENGLAND LAW FIRM and MAIER GUTIERREZ & ASSOCIATES, hereby demand a trial by jury and complain and allege against Defendants as follows:

## PARTIES

1.      Plaintiff JUDY DOE NO. 1 ("Judy Doe No. 1") is, and at all times pertinent hereto was, a resident of Clark County, Nevada.

2.      Plaintiff JUDY DOE NO. 2 ("Judy Doe No. 2") is, and at all times pertinent hereto was, a resident of Clark County, Nevada.

3.      Plaintiff JUDY DOE NO. 3 ("Judy Doe No. 3") is, and at all times pertinent hereto was, a resident of Clark County, Nevada.

4.      Plaintiff JUDY DOE NO. 4 ("Judy Doe No. 4") is, and at all times pertinent hereto was, a resident of Clark County, Nevada.

5.      Plaintiff JUDY DOE NO. 5 ("Judy Doe No. 5") is, and at all times pertinent hereto was, a resident of Clark County, Nevada.

6.      Plaintiff JUDY DOE NO. 6 ("Judy Doe No. 6") is, and at all times pertinent hereto was, a resident of Clark County, Nevada.

7.      Plaintiff JUDY DOE NO. 7 ("Judy Doe No. 7") is, and at all times pertinent hereto was, a resident of Clark County, Nevada.

8.      Plaintiff JUDY DOE NO. 8 ("Judy Doe No. 8") is, and at all times pertinent hereto was, a resident of Clark County, Nevada.

9.      Plaintiff JUDY DOE NO. 9 ("Judy Doe No. 9") is, and at all times pertinent hereto

1  was, a resident of Clark County, Nevada.

2        10.    All Plaintiffs believe that public disclosure of their identities will subject them to

3  further retaliation, humiliation and scorn, will invade their solitude and privacy and that of their

4  families if it becomes known what lurid and abusive conduct was directed at them by Steve Wynn.

5        11.    Defendant WYNN LAS VEGAS, LLC is the corporate entity issuing paychecks to

6  Plaintiffs. According to 3/15/19 Massachusetts Gaming Commission *Investigative Report,* this is the

7  subsidiary entity ultimately controlled by Defendant WYNN RESORTS, LIMITED, the parent

8  company, and both are being sued herein and hereinafter collectively called "Wynn Resorts". These

9  defendant entities are, at all times pertinent hereto, Nevada corporations or business entities and

10  together with the fictitious defendants described below, these Wynn Resorts defendant entities operate

11  two side by side, connected luxury hotels and casinos, known as Wynn Las Vegas and Encore Resort,

12  which were founded, built, managed and fully controlled by Steve Wynn, the largest shareholder, until

13  March 2018. These properties are located at 3131 South Las Vegas Boulevard, Las Vegas, Nevada.

14  These properties are operated through various business entities and licenses, including Defendants,

15  holding business, gaming and liquor licenses to do so, and are authorized to and are conducting

16  business in Clark County, Nevada.

17        12.    Plaintiffs are not familiar with the complex corporate interrelationships through which

18  the named defendants WYNN RESORTS operates these world famous, multi-million dollar luxury

19  hotel and gaming properties, Wynn Las Vegas and Encore Resort, where the Plaintiffs are employed.

20  Thus, the true names and capacities, whether individual, corporate, subsidiary, associate, partnership,

21  joint venturers or otherwise, of these fictitious (additional) defendants herein designated as DOES I

22  through X and ROE CORPORATIONS I through X, inclusive. Their identities and names are

23  unknown to Plaintiffs at this time, who therefore sue these defendants by fictitious names.

24        13.    These fictitious defendants, acting with or at the direction of the named Defendants,

25  may also be responsible and therefore liable for the injurious conduct or illegal conduct which harmed

26  each of the Plaintiffs. Plaintiffs will seek leave of the Court to insert the true names and capacities of

27  such Defendants when the same have been ascertained and will further seek leave to join said

28  Defendants in these proceedings.

14.   Defendants engage in activities which affect interstate commerce and they employ more than 15 employees in the timeframes required and thus are subject to both the Nevada statutes and federal statutes prohibiting discrimination.

## JURISDICTION AND VENUE

15.   This is a civil action brought by Plaintiffs for damages and injunctive relief under Nevada's anti-discrimination law (including NRS 613.330 *et seq.*) and under the federal anti-discrimination statute, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*   Defendants are employers subject to the aforementioned statutes and the Plaintiffs, as employees, are entitled to the full protection of those statutes.

16.   Jurisdiction is proper pursuant to NEV. REV. STAT. § 14.065 and 28 U.S.C. § 1331, and for the torts pled below, the amount in controversy for each Plaintiff exceeds $15,000.

17.   Venue is proper as each Plaintiff resides in this judicial district, Defendants conduct business in this judicial district, and the acts complained of occurred wholly or in part in this judicial district. Venue is also proper in this judicial district pursuant to 28 U.S.C. §1391 because "a substantial part of the events or omissions giving rise to the claim[s] occurred" in Nevada.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

18.   All Plaintiffs filed paperwork resulting in individual formal charges of discrimination with the Equal Employment Opportunity Commission ("EEOC"), dual-filed with the Nevada Equal Rights Commission ("NERC").  These filings fulfilled Plaintiffs' obligations to initiate administrative claims before filing suit.

19.   In administrative filings, which began in March 2018 and thereafter, each Plaintiff provided sworn, detailed, explicit factual statements and some corroborative documents (when possible) demonstrating that they had been subjected to years of illegal sex discrimination by Wynn Resorts, their employer, in the form of Steve Wynn's sexual harassment, along with the creation and maintenance of a hostile work environment at Wynn Resorts due to the enabling and toleration of Steve Wynn's misconduct by high level Wynn executives and human resources personnel, the lack of effective internal complaint or HR procedures, and their (Plaintiffs) legitimate fear that complaining would lead to retribution and even job loss.  The Plaintiffs also alleged in their administrative filings

that since the January, 2018 public media disclosure of the enormity and duration of Steve Wynn's misconduct, the manner in which Wynn Resorts responded to those allegations, as detailed below, constitutes retaliation, in violation of state and federal law, which continues to present.

20.      Based on documents now available to Plaintiffs, in March, April and May, 2018, the EEOC notified Wynn Resorts (addressed to Troy Mitchum, VP of HR) of the identities of Wynn Resorts employees making claims to the EEOC in the spring of 2018.  Later, in the spring and summer of 2018, the EEOC provided Wynn Resorts with copies of the Charges of Discrimination filed by at least ten employees, including these nine Judy Doe Plaintiffs.

21.      Based on documents now available to Plaintiffs, the EEOC appears to have commenced its investigation seven months later, in November 2018.  For months thereafter, the EEOC made requests but then allowed Wynn Resorts to escape the usual disclosures required of employers, including filing of position statements, providing lists of Salon employees, personnel files, etc.  Upon information and belief, in June or July 2019, without notifying the Plaintiffs, the EEOC may have entered into a secret conciliation/settlement agreement with Wynn Resorts, which offered no compensation or Title VII remedy of any kind to any Charging Party (employees who had Charges) for the past discrimination and retaliation they were and many  co-workers were subjected to.

22.      On or about July 2, 2019, the EEOC issued each Plaintiff an individual "Notice of Right to Sue" notice, all received on July 5, 2019.

23.      This suit is being filed within 90 days of Plaintiffs' receipt of the "Notice of Right to Sue" notices.  Thus, Plaintiffs have met all administrative exhaustion prerequisites to bring this lawsuit.

## **GENERAL ALLEGATIONS**

24.      Plaintiffs are all current employees of Wynn Resorts who are working in the Wynn Salon and/or Encore Salon (collectively referred to as the "Salon").

25.      Wynn Resorts was built, owned and operated by Wynn Resorts' Chairman and CEO Steve Wynn. For decades prior to March 2018, Steve Wynn personally selected the high-level management executives who operated his world famous hotel and casino properties under his direction.  Steve Wynn personally recruited and selected the board members of the companies he

1    controlled, including the Defendants herein.  Defendants' high-level executives, past and some
2    current, enabled, facilitated and covered up decades of wrongful, abusive sex-based Steve Wynn
3    misconduct in this Wynn Resorts workplace and in earlier Wynn-controlled workplaces.   This
4    misconduct included, but is not limited to, Steve Wynn's using the Wynn Resorts workplace as his
5    personal hunting ground, finding and subjecting female employees to sexual advances, sexual
6    harassment, inappropriate touching, and pressuring female Wynn Resorts employees to perform sex
7    acts on him.

8         26.     Upon information and belief, on or around late 2017/early 2018, various national
9    media outlets began investigating Steve Wynn's years of workplace misconduct and the pattern and
10   practice of Wynn Resorts of failing to address it.

11        27.     According to the *Investigative Report* issued by the Massachusetts Gaming
12   Commission on March 15, 2019 and the hearings conducted on April 2,3 and 4, 2019, Wynn Resorts
13   learned beforehand that national media was about to publish stories about Steve Wynn's misconduct
14   and years of cover-up.

15        28.     Before publication, on or around January 17, 2018, Wynn Resorts convened a pre-shift
16   meeting for Salon employees where Maurice Wooden (then-President of Wynn Las Vegas) and Troy
17   Mitchum (then-Vice President of Human Resources and son of Steve Wynn's longtime executive
18   assistant Cindy Mitchum) told Salon employees that Wynn Resorts knew reporters were contacting
19   employees and that if anyone was threatened by the reporters they should let Troy Mitchum know and
20   he would handle it.

21        29.     At this January 17, 2018 pre-shift meeting, Wynn Resorts President Maurice Wooden
22   emphasized that nobody should talk to reporters.

23        30.     Troy Mitchum and Maurice Wooden's comments at the January 17, 2018 pre-shift
24   meeting made Salon employees (including Plaintiffs in attendance and those who learned about it
25   later) understand that Wynn Resorts did not want them to tell the media the truth about Steve Wynn
26   misconduct and the years of cover-up.  A number of Salon employees, including Plaintiffs, knew they
27   had been abused and mistreated by Steve Wynn in years past. For years, they had lived in fear of being
28   chosen (again) by Steve Wynn to be his sexual prey and now they feared being exposed now as one

of his victims. They also scared, even more so, that because Defendants made it clear that Steve Wynn was still in charge, Wynn Resorts might take some action against them if they spoke the truth about him, either internally or to the media.

31.     Beginning on January 26, 2018, numerous national media outlets published reports of years of Steve Wynn's misconduct at his hotels and casinos, that he had been abusing his power and committing sexual harassment, especially able to harass Salon and Spa female employees who were unable to escape him and were required to provide him services (situations he used to compromise and exploit them, often in private.)

32.     Later on that same day, January 26, 2018, Wynn Las Vegas President Maurice Wooden issued a memo that Wynn Resorts was "supportive" of Steve Wynn and his leadership, and that the news media was just trying to assail Steve Wynn. A copy of the Wooden memo as posted in Plaintiffs' workplace is attached as **Exhibit 1**.

33.     Wynn President Maurice Wooden's memo shocked and dismayed many Salon employees, including Plaintiffs. As usual, Wynn Resorts was quick to defend Steve Wynn and did not (and had not ever) investigated allegations of his wrongdoing, past cover-ups and rumored payoffs to victims. Wynn Las Vegas President Maurice Wooden's memo was designed to stifle the speech of Wynn Resorts employees (including Plaintiffs) who had experienced abusive conduct by Steve Wynn or who knew or suspected that some of their Salon or Spa co-workers had been his victims over many years.

34.     Following this media exposure, on January 31, 2018, the Massachusetts Gaming Commission opened an investigation into Wynn Resorts in relation to their gaming licenses. Nevada gaming authorities did so shortly thereafter. Neither of those agencies have the power or authority to compensate victims such Plaintiffs and their co-workers for injuries or damage.

35.     On January 31, 2018, Wynn Resorts convened a mandatory meeting for Salon staff at the Wynn Country Club for a personal appearance and statement by Steve Wynn. While his security and top executives lined the walls, Steve Wynn asked the 40+ Salon employees assembled to raise their hands if they ever felt assaulted or abused by him, pressuring the Salon employees to "out" themselves and subject themselves to further humiliation and possible retaliation.

36.     Many Salon employees (including Plaintiffs) felt intimidated during and after this January 31, 2018 Wynn Country Club meeting. Defendants' high level executives and security personnel were located at the sides of the room, observing the reactions of the Salon employees assembled. Salon employees, Plaintiffs included, knew that most, if not all, of high level executives knew that at least some of Steve Wynn's past victims would be in this audience.

37.     At this January 31, 2018 Wynn Country Club meeting, Steve Wynn claimed he and the Salon employees were "family," and said he would protect them from the media. This pitted the Salon employees against the reports in media about his misconduct, and implied that the Salon employees were not welcome to voice their concerns to the media or internally within Wynn Resorts.

38.     On or around February 1, 2018, Steve Wynn appeared at the Salon, with a camera crew, to participate in birthday celebration for an 80 year old Salon employee, a highly unusual event for Steve Wynn. Steve Wynn joked about sexually harassing that female employee, kissed her on the lips, initiated kisses and group hugs with other Salon employees, and made intimidating comments about the press. His conduct disgusted some of the employees and made many other employees present extremely uncomfortable and fearful.

39.     Steve Wynn's behavior at the February 1, 2018 birthday celebration intimidated many Salon employees, including Plaintiffs present or who later heard about it. His conduct and comments sent a clear message that Steve Wynn was still in control and that he was still fully supported by their employer, Wynn Resorts. This implicitly suggested that raising concerns about current or past Steve Wynn misconduct would have grave and damaging consequences.

40.     At the February 1, 2018 birthday celebration, Salon employees, including some Plaintiffs, were told by their Salon Director, Claude Baruk, that he needed them to go on camera to say that Steve Wynn had not assaulted or abused them, and to make complimentary statements about Steve Wynn. Some did, fearing retribution if they declined. Other Plaintiffs (and other employees) not present learned that employees were being asked to do testimonials on video about Steve Wynn. They feared being asked, believing that declining or avoiding Mr. Baruk's request would have serious consequences, such as retaliation in the workplace or that the refusal would identify the person as a victim of Steve Wynn in the past. Salon Director Claude Baruk had been selected and installed as

Salon Director, displacing prior longtime Salon Director Jorgen Nielsen in 2013.  Mr. Baruk was known to be in close contact with Steve Wynn and the new Mrs. Steve Wynn, Andrea Wynn, who resided in a private villa at the Wynn Hotel.

41.     Under the circumstances, this filming was coercive and personally invasive, making Salon employees feel like if they said no to being captured on camera, they would be punished.  It also invaded the privacy of certain Salon employees who had no desire to have their image recorded for Wynn Resorts' use, or put them in a false light by making it seem that they were supporting Steve Wynn and vouching that he had not done the things being reported in the media.

42.     On or around February 6, 2018, Steve Wynn resigned from his position as chairman and CEO of Wynn Resorts but continued to live in his private villa at the Wynn Hotel for a number of months.

43.     Salon employees became aware that Steve Wynn continued to ask for receive salon services through late February 2018 and March 2018 (including by some of the Plaintiffs).  Salon employees, including Plaintiffs, took this as a signal that Wynn Resorts was still being controlled by Steve Wynn, and that his conduct and misconduct would continue to be tolerated and even covered up, and that Wynn Resorts was not interested or serious about protecting its employees, and certainly not from Steve Wynn or his remaining allies in the executive ranks (such as Matt Maddox).

44.     On or around February 15, 2018, a member of Defendants' in-house legal counsel and another individual gathered on duty Salon employees into the Salon break room and handed out business cards with the phone numbers of the Nevada Gaming Control Board and Massachusetts Gaming Commission.  They said that Salon employees (including Plaintiffs) that these were the only people they (the employees) should be talking to.  This made the Salon employees fear retaliation if they dared to report their complaints or past bad experiences with Steve Wynn to anyone else or to the media.

45.     In March 2018, Wynn Resorts began scheduling certain Salon employees for mandatory meetings with Wynn Resorts' "investigatory counsel" (Gibson, Dunn), the second law firm (according to media accounts read by Plaintiffs) retained by Wynn Resorts' Board of Directors to investigate. Without sensitivity to the situation and the turmoil in the workplace, these meetings

1    were arranged and coordinated (booked) by Claude Baruk, Salon Director, long-time personal
2    hairstylist of Steve Wynn's wife Andrea Wynn, personal friend of Steve and Andrea Wynn and
3    believed to be in daily contact with Steve Wynn. No one asked the employees if they would like to be
4    interviewed. The interviews were conducted at the property itself (in the Tower Suites at The Wynn)
5    so that who was being interviewed became common knowledge in the Wynn workplace. These
6    requests and Baruk's involvement scared employees, Plaintiffs included, and these interviews took
7    Salon employees away from paying customers and impacted their earnings.

8         46.    From Plaintiffs' perspective, very little was done to protect the employees being
9    summoned from possible retribution.  Gibson Dunn attorneys gave employees nothing in writing
10   assuring them or proving the legitimacy and independence of the Gibson Dunn inquiry. It is believed
11   that some employees did provide information about Steve Wynn's sexual harassment of employees
12   and that for many years, high level executives who knew about it did nothing or very little or covered
13   it up. This outside investigation was poorly perceived, making Salon employees feel even more
14   uncomfortable. They were worried that they were being punished or retaliated against for being Steve
15   Wynn's victims. Some Plaintiffs were interviewed, some were not when they disclosed they were
16   represented by counsel.

17        47.    On or around March 14, 2018, Wynn Resorts called still another meeting with Salon
18   employees, this one conducted by Wynn Resorts CEO Matt Maddox, known to have been operating
19   the Wynn empire with Steve Wynn himself and long-time Wynn General Counsel Kim Sinatra for the
20   past few years. Mr. Maddox said he was "taking over," and asked "How can we help you?"  This
21   made many Salon employees very uneasy, because Mr. Maddox, widely perceived as Steve Wynn's
22   hand-picked successor, was part of the problem of enabling or covering up Steve Wynn's past abusive
23   and harassing conduct in the Wynn workplace.

24        48.    Then, on or around March 23, 2018, Patricia Mulroy[1] issued a letter addressed to
25   employees which was posted on the Salon bulletin board. It stated that anyone had information

26   _____

27   [1] At the time, the only female Wynn Resorts Board member, believed by most to have recruited by
28   Steve Wynn.

1   regarding sexual harassment allegations at the Wynn, they should report the information to the Board

2   of Directors' investigators.  Certain Salon employees (including Plaintiffs) were put off by this letter,

3   rightfully concerned that the Board's investigation was not sufficiently independent because of Ms.

4   Mulroy's connections with Steve Wynn.  Salon employees also learned from media accounts that the

5   firm conducting the investigation, Gibson Dunn, was the former law firm of Wynn General Counsel

6   Kim Sinatra, known to be a close confidante and enabler of Steve Wynn.  This made Salon employees

7   fear this investigation was not going to be independent, fair or honest, and that this was still another

8   way of identifying and getting rid of "troublesome" employees — ones who, through no fault of their

9   own, became victims of Steve Wynn's sexual harassment.

10          49.     Salon employees, including Plaintiffs, believed that Wynn Resorts singled out the

11   Salon employees by making them all acknowledge on the computerized employee portal that they had

12   read Ms. Mulroy's March 23, 2018 letter.  The Salon employees (including Plaintiffs) were disturbed

13   that Wynn Resorts was forcing this letter on them, and it led to them being afraid of being targeted

14   and/or their employment terminated or adversely affected if they declined to read it.

15          50.     On April 26, 2018, Steve Wynn filed a defamation lawsuit against former Salon

16   Director Jorgen Nielsen, a suit which received media attention. Mr. Nielsen was the named and quoted

17   source of information in the *Wall Street Journal* article. Plaintiffs and others who have spoken out

18   against Steve Wynn fear that the extraordinarily wealthy Steve Wynn will sue them too, even if they

19   are speaking the truth.

20          51.     At that time, Defendants did nothing to distances themselves from Steve Wynn's use

21   of litigation to intimidate others from coming forward and telling the truth about his misconduct.

22          52.     In 2018, the Massachusetts Gaming Commission and the Nevada Gaming Control

23   Board conducted extensive investigations into Wynn Resorts, its Board members, and executives.

24   Eventually, Steve Wynn sued the Massachusetts Gaming Commission and its Director of

25   Investigation, sending another message to all who dare speak out against him.

26          53.     On or around May 8, 2018, Wynn Resorts conducted another meeting with Salon

27   employees, this one featuring Wynn Resorts CEO Matt Maddox. Salon employees felt uncomfortable

28   in this meeting because of their reasonable perception that Mr. Maddox was so high up and closely

11

1    allied with Steve Wynn that he knew or should have known of Steve Wynn's misconduct.

2         54.   Based on a complaint issued earlier, or around February 26, 2019, the Nevada Gaming

3    Control Board fined Wynn Resorts $20 million, the highest fine ever assessed by Nevada gaming

4    regulators, for Wynn Resorts' failure to investigate claims from numerous women that they had been

5    sexually harassed in the Wynn workplace by Steve Wynn, and the handling of those matters.

6         55.   On March 15, 2019, after a lengthy investigation involving many past and present high-

7    level  Wynn  Resorts  executives  and  victims  of  Steve  Wynn's  workplace  misconduct,  the

8    Massachusetts Gaming Commission released its "Investigative Report Regarding Ongoing Suitability

9    of Wynn MA, LLC" ("*Investigative Report*").

10        56.   The Massachusetts Gaming Commission's *Investigative Report* found that over a

11   course of years, "a limited group of executives and employees in positions of authority at [Wynn

12   Resorts], including in the legal division, disregarded Company policies when it came to certain

13   allegations of sexual misconduct against [Steve] Wynn involving employees."

14        57.   The Massachusetts Gaming Commission's *Investigative Report* found that "certain

15   executives, with the assistance of outside counsel, took measures to conceal allegations against [Steve

16   Wynn] that came to their attention," and these "efforts at secrecy made it exceedingly difficult, if not

17   impossible, for gaming regulators to detect this potentially derogatory information through typical

18   regulatory means, which rely heavily on robust self-disclosures by the applicant/licensee."

19        58.   The Massachusetts Gaming Commission's *Investigative Report* found  Wynn Resorts'

20   corporate failures are "significant, repetitive, and reflective of the Company's historical governance

21   practices," as there was a "culture where employees were reluctant to report allegations against [Steve]

22   Wynn to management."

23        59.   On April 2, 3, and 4, 2019, the Massachusetts Gaming Commission conducted

24   Adjudicatory Hearings about these Wynn matters. On April 2, 2019, during Wynn Resorts opening

25   statement,  President and CEO Matt Maddox testified to the following under oath to explain how he

26   first supported Steve Wynn and only later came to believe the truth about Steve Wynn's conduct:

27        "As those investigations began, the denial changed and I began to realize that there were many

28        victims and those victims felt powerless, and for that I'm deeply remorseful.  They felt they

12

didn't have a voice, that if they were to speak up, they would be retaliated against, or if they did it, it wouldn't be investigated, and for that I'm truly sorry."

Mass Gaming Commission Adjudicatory Hearing Transcript, 4/2/19, 29:5-12

60.     On April 4, 2019, President and CEO Matt Maddox testified. Wynn Resorts had indicated that it had allegedly implemented a new and "enhanced" sexual harassment policy in which eight areas were enhanced.  When asked to name just two or three of those enhancements, Mr. Maddox was unable to articulate any. Thus, it appears that Wynn Resorts still has not provided adequate or effective training about the new "enhanced" sexual harassment policy to high level Wynn Resorts employees.

61.     In or around April 8, 2019, Wynn Resorts submitted its Post-Hearing Brief to the Massachusetts Gaming Commission regarding the ongoing suitability of Wynn Resorts, which included many admissions.

62.     Wynn Resorts admitted to being "responsible for those mistakes", admitting to the lack of proper response to sexual harassment complaints against Steve Wynn.

63.     Wynn Resorts admitted to taking "full responsibility" for the "failures of several former executives to respond appropriately to complaints against [Steve] Wynn," which left "many of the victims . . . powerless and without a voice."

64.     On April 30, 2019, the Massachusetts Gaming Commission released its "Decision and Order" regarding the suitability of Wynn Resorts and its high-level executives to maintain gaming licenses.

65.     While the Massachusetts Gaming Commission ultimately determined that  (a Steve-Wynn-less)  Wynn Resorts remained suitable to operate a Massachusetts casino, they imposed  a $35 million fine on Wynn Resorts, and levied an additional $500,000 fine on Matt Maddox individually, and imposed certain conditions imposed on Wynn Resorts, its Board of Directors, and Matt Maddox. These conditions included the implementation of and compliance with human resources policies better addressing sexual harassment.

66.     The Massachusetts Gaming Commission expressed its unanimous concern that Wynn President and CEO Matt Maddox "routinely failed to exercise the proper diligence, express the

1    requisite level of concern, [nor did he] understand the magnitude of the risk and legal implications

2    associated with much of the information of which he was, or should have been, aware."

3        67.     High-level Wynn Resorts executives and Board members have continued to use the

4    services of Salon employees (including Plaintiffs) and in doing so, have made startlingly inquiries to

5    those same employees about their experiences which employees, including Plaintiffs, find unnerving.

6        68.     Defendants have not constructed a way to remedy and pay for the harm these years of

7    abuse, misconduct and corporate cover up have inflicted on many Wynn Resorts employees, past and

8    present, Plaintiffs included, ruining many lives, livelihoods and reputations. Defendants' inaction in

9    relation to the victims forced the resort to media by some to tell the story, and that inaction (by

10    Defendants) is forcing victims, who wish to remain out of public view and humiliation, to file lawsuits

11    to secure appropriate remedies and compensation. This is probably not one of the "best practices"

12    President and CEO Matt Maddox promised the Massachusetts Gaming Commission the Wynn was

13    undertaking to show "leadership" on this issue.

14

15                **Specific Allegations Relating to Each Judy Doe Plaintiff**

16        69.     All Plaintiffs are currently employed by Wynn Resorts. Judy Doe No. 1 has been

17    employed by Wynn Resorts since 2004; Judy Doe No. 2 since 2006; Judy Doe No. 3 since 2006, Judy

18    Doe No. 4 since 2005, Judy Doe No. 5 since 2008; Judy Doe No. 6 since 2005;  Judy Doe No. 7 since

19    2006; Judy Doe No. 8 since 2005; and Judy Doe No. 9 since 2005.

20        70.     The Plaintiffs, as Wynn Salon employees, understood they were employed in what is

21    considered perhaps the finest salon in Las Vegas, with good compensation, a gorgeous workplace

22    setting, and good benefits.

23        71.     The Plaintiffs, all female, are employed by Defendants as manicurists and makeup

24    artists. They are licensed professionals, experienced, and highly qualified. All provide exceptional

25    and highly competent, well-regarded personal services through their employment at the Wynn Salon

26    and Encore Salon, either in the Salon setting, or (as offered by Salon) as in-room services.

27        72.     These Judy Doe Plaintiffs are suing using pseudonyms to protect themselves, their

28    families, their jobs and their own well-being. Providing more detail, about themselves or the

misconduct and illegal discrimination to which they have been subjected, would lead to the public disclosure of their identities. This public disclosure is not necessary for this suit because the Defendants-employers know exactly who they are, and have copies of each of their EEOC Charges of Discrimination.

73.     During their employment, the Plaintiffs saw, surmised, heard about and suspected misconduct by Steve Wynn. They were aware that female co-workers being selected or called for by him (via Cindy Mitchum and others), they saw or learned that female co-workers had returned from giving him salon services and were in obviously in extreme distress, heard about his unwelcome sexual advances to other female employees, heard or experienced his exposure of his genitals and his penchant for being scantily clothed during services, his inappropriate invading space, touching and rubbing employees doing his services, his talking about sex or making inquiries into their personal (and sex) lives, his promises of better work or money if they would have sex with him, his insistence on having services at his private villa or his office at The Wynn (often arranged by his personal secretary/assistant, Cindy Mitchum, mother of HR Director Troy Mitchum), the presence and his sole control over his scary guard dogs, and having heard the even uglier rumors of his impregnating, sexually assaulting or raping female employees.

74.     Plaintiffs observed, along with their co-workers, that Steve Wynn seemed to focus and prey upon on certain Salon employees as his favorite for a while, and when he seemed to tire of them (perhaps their having rejected his sexual advances), he moved on to his next female employee-victim. With a few exceptions (a color stylist), Steve Wynn insisted on having female employees provide Salon services to him. Thus for years, Plaintiffs and many of their female Salon co-workers lived in fear of catching Steve Wynn's attention and becoming the requested Salon service provider sent to do his services.

75.     Additionally, and importantly for this suit, each of the individual Judy Doe Plaintiffs also suffered similar but individualized acts of sexual harassment and personal degradation by Steve Wynn, over a period of time, but at different times, with different durations and under different (and unique) circumstances and consequences for each female plaintiff.

76.     In their Charge of Discrimination, which the EEOC provided to Wynn Resorts more

than a year ago, each of the Plaintiffs provided wrenching and detailed accounts of their interactions with Steve Wynn himself from 2004 (for some) to and through 2018 and the disgusting acts of predation he committed against them, why they didn't report it, and why they felt humiliated, shamed and retaliated against by Wynn Resorts actions after the first *Wall Street Journal* article was published on January 26, 2018.

77.     The Plaintiffs feared that they might lose their jobs back when Steve Wynn was abusing them or in 2018 when the news stories appeared, confirming their own experiences and their suspicions of horrendous stories about their co-workers and the knowledge, complicity and cover-up of Steve Wynn's misconduct by Wynn executives, including but not limited to past Wynn president Marc Schorr, Hotel president Doreen Whennen,  General Counsel Kim Sinatra, Wynn president Maurice Wooden, VP Brian Gullbrants, HR VP Troy Mitchum, Salon Director Claud Baruk, and others. All feared that being identified as one of Steve Wynn's many victims, then and now, would subject them to additional humiliation, public and on the job, and would most likely subject them to retribution on the job during the period of time that Defendant Wynn Resorts, through its officials such as Mr. Wooden and Mr. Mitchum, were claiming full support of Steve Wynn.

78.     Similarly, none of the Plaintiffs wish to jeopardize their personal safety, solitude, privacy and reputation or to subject themselves further to the public humiliation of being known as a victim of Steve Wynn, nor to expose themselves to his meritless suits for defamation, which is why they resorted to the confidential EEOC administrative process.

79.     Unfortunately for Plaintiffs, Wynn Resorts manipulated and exploited that process, and in doing so, managed to avoid a full EEOC investigation, to these Plaintiffs' detriment and harm. For example, Wynn Resorts failed to submit position papers. Wynn Resorts failed to provide the EEOC with the (professionally gathered facts) in the 3/15/19 Mass Gaming Commission *Investigative Report*. Wynn Resorts failed to provide the EEOC with the Gibson Dunn investigative report. Both would corroborate Plaintiffs' individualized stories and Defendants' Title VII liability. No doubt those reports would have provided the understaffed and poorly funded EEOC more than enough evidentiary support for an EEOC finding of discrimination and retaliation.

80.     Instead, and worst of all for the nine Judy Doe Plaintiffs, in the EEOC matters, Wynn

1    Resorts is believed to have entered into a secret conciliation/ settlement agreement with the EEOC,

2    believed to be based on Wynn's promise to do better in the future, but which ignores the victims of

3    past discrimination and does not address the obligation of Wynn Resorts to remedy (pay for) that past

4    discrimination, as required by Title VII and Nevada anti-discrimination law.

5        81.    Plaintiffs are being forced to file this public suit as a last resort, because their employer,

6    Wynn Resorts has failed to fulfill its obligations under Title VII to remedy discrimination which has

7    occurred, make victims whole and prevent future occurrences.

8        82.    To salvage its gaming licenses, Wynn Resorts conceded and admitted to Steve Wynn's

9    misconduct and that of past executives (and board members) loyal and beholden to him by the massive

10    fines Wynn Resorts  has now paid to Massachusetts and Nevada gaming enforcement agencies but

11    Defendants did nothing to compensate victims or make them whole.

12        83.    Wynn Resorts commissioned the Gibson Dunn investigative report and submitted it, is

13    believed, to Massachusetts gaming authorities. Coupled with its other submissions and testimony,

14    Defendants are fully aware of the massive weight of corroborative evidence proving them liable for

15    Plaintiffs' claims as asserted herein.

16        84.    If the Defendant-employers seek dismissal of this suit based on or if Defendants

17    challenge the legal sufficiency of the factual assertions in this Complaint, or attempts to so on an

18    individual basis for any plaintiff, Plaintiffs are willing to provide the information (information

19    Defendants already have) in a confidential way which might minimize further harm being inflicted on

20    them by their employer's handling of these matters.

21                   **FIRST CLAIM FOR RELIEF**

22       **Discrimination Based on Sex in Violation of State and Federal Statutes**

23                   **Sexual Harassment**

24        85.    Plaintiffs repeat and reallege each and every allegation of the proceeding paragraphs

25    of this Complaint as though fully set forth herein and incorporate the same by reference.

26        86.    Plaintiffs are members of the class of persons protected by state and federal statutes

27    prohibiting discrimination based on sex, and sexual harassment is a form of illegal sex discrimination.

28        87.    Plaintiffs were all qualified for their respective positions at the Salon at Wynn Resorts

1     and were performing their job tasks competently.

2          88.     Defendants qualify as employers subject to all Nevada and federal statutes prohibiting

3     discrimination, NRS 613.330 *et seq.* and Title VII, 42 U.S.C. § 2000e *et seq.* as amended, and thus,

4     Defendants have a legal obligation to provide Plaintiffs and all employees a workplace free of

5     unlawful discrimination and to investigate and then to remedy the situation if discrimination occurs.

6          89.     Defendants failed to take reasonably adequate steps to prevent discrimination against

7     Plaintiffs by failing to prevent years of Steve Wynn's rampant sexual harassment (predation) of female

8     employees. Additionally, the widespread nature of this predation also created a hostile work

9     environment which was compounded by Defendants' high level executives tolerating and ratifying

10    his misconduct. Over a number of years, key high level executives and legal counsel were aware that

11    (a) huge payments were made on a number of occasions to female employees who made claims about

12    Steve Wynn's wrongful, sexually-based conduct; and (b) some complaining employees or employees

13    injured by Steve Wynn's conduct were let go, acted against, or even fired for pretextual reasons, or

14    simply disappeared from the workplace.

15         90.     With a few exceptions, Steve Wynn insisted that female Salon and Spa employees

16    provide his services and Defendants knew of that propensity, which might have been legitimate under

17    other circumstances or for someone else (privacy interests for personal services), Steve Wynn's sexual

18    advances and misconduct towards his female employees was widely known. For years, Plaintiffs and

19    many of their female Salon co-workers lived in fear of catching Steve Wynn's attention and becoming

20    the requested Salon service provider sent to do his services.

21         91.     Plaintiffs were subjected to offensive verbal or physical conduct based on their gender,

22    female.

23         92.     Plaintiffs did not welcome Steve Wynn's objectively offensive verbal or physical

24    conduct but felt helpless and without ways to make it stop without suffering adverse consequences in

25    their workplace.

26         93.     The objectively offensive, unwelcome verbal and physical conduct by Steve Wynn

27    against each Plaintiff, and their knowledge that some of their female co-workers were also being

28    abused by him was sufficiently severe or pervasive to alter the terms and conditions of Plaintiffs'

1     employment and thereby created an abusively hostile work environment.

2          94.     Defendants have discriminated against Plaintiffs through the actions of high level

3     executives who knew or should have known of Steve Wynn's misconduct, who failed to prevent it,

4     who failed to properly investigate complaints made regarding Steve Wynn's inappropriate workplace

5     misconduct, and which was (at times) open and obvious, and as a result, Defendants are deemed to

6     have ratified it, all of which created an illegal and hostile work environment for each of the Plaintiffs

7     for many years. This also constitutes a pattern and practice of illegal sex discrimination by Defendants

8     over many years.

9          95.     Defendants, as employers, are not entitled to assert the affirmative defense that the

10     Plaintiffs unreasonably failed to use their employer's complaint procedure (also known as the

11     *Burlington/Faragher* affirmative defense). Defendants' policies and complaint procedure did not

12     work. Thus, Plaintiffs were reasonable in their belief that the usual rules and the alleged "zero

13     tolerance" of sexual harassment did not apply to misconduct by Steve Wynn, and that going to human

14     resources would be useless and possibly dangerous.

15          96.     Additionally, it was well-known that high level executives had been complained to or

16     alerted to Steve Wynn's misconduct, or that his misconduct (sexually preying on his female

17     employees, especially those called upon to provide personal Salon or Spa services) was so blatant and

18     obvious that it was known to all. Some high level executives promised from time to time to make him

19     stop, but it didn't and Plaintiffs observed that women who had complained about or were seriously

20     harmed by his misconduct were fired or disappeared from the Wynn workplace through the actions

21     and tacit approval of human resources. This frightened Plaintiffs into silence and shame, which was

22     the intended effect. This also constitutes a pattern and practice of illegal sex discrimination by

23     Defendants over many years.

24          97.     Defendants' actions, including unequivocal expressions of support for Steve Wynn,

25     upon the January, 2018 media publications continued and magnified the illegal hostile environment

26     in Plaintiffs' Wynn Resorts workplace in many ways, including but not limited, creating fear, anger

27     and turmoil in that workplace.

28          98.     Each of the Plaintiffs was embarrassed, humiliated, frightened, angered, and

1    discouraged by these discriminatory actions (Steve Wynn's misconduct and the hostile work

2    environment) in their workplace, Defendants' enabling, toleration and ratification of same. As a direct

3    and proximate cause of this illegal conduct, each of them has suffered compensable economic losses

4    and emotional distress over many years. Pursuant to 1991 Amendments to Title VII, in addition to

5    any economic losses Plaintiffs may be entitled to recover under Title VII, Plaintiffs are entitled to be

6    fully compensated for emotional distress caused by this discrimination.

7        99.    Pursuant to 1991 Amendments to Title VII, each of the Plaintiffs is also entitled to

8    recover punitive damages for Defendants' malicious, intentional, and repeated violations of federal

9    and state anti-discrimination laws. An employer of the size, reputation, and expertise of Defendants

10    should have prevented the blatant and systemic disregard of anti-discrimination laws by

11    founder/owner/operator Steve Wynn and then the enabling toleration and ratification by Wynn Resorts

12    executives, attorneys and perhaps, it appears, even Board members. Thus, Plaintiffs are entitled to

13    recover punitive damages in an amount sufficient to punish Defendants for this illegal conduct and to

14    deter other employers from engaging in such conduct in an amount to be determined by the jury

15    deemed sufficient to do so.

16        100.    Under applicable federal law, Plaintiffs are entitled to recover all of their attorneys'

17    fees and costs, and to secure the injunctive relief pled more specifically below.

18                        **SECOND CLAIM FOR RELIEF**

19               **Retaliation in Violation of State and Federal Statutes**

20        101.    Plaintiffs repeat and reallege each and every allegation of the proceeding paragraphs

21    of this Complaint as though fully set forth herein and incorporate the same by reference.

22        102.    In violation of NRS 613.340 and 42 U.S.C. § 2000e *et seq.*, Defendants retaliated

23    against each of the Plaintiffs by failing to investigate and acknowledge Steve Wynn's misconduct,

24    and continuing the complicity of company executives chosen and beholden to Steve Wynn to deny

25    and continue to cover up years of Steve Wynn's misconduct and the havoc he wreaked on his

26    employee-victims through his power and authority in Wynn workplace.

27        103.    Plaintiffs (as employees) were punished and retaliated against as a whole following the

28    publication of articles exposing Steve Wynn's conduct as a long time workplace sexual predator.

104.  Defendants explicitly and implicitly discouraged Plaintiffs from expressing their concerns about discrimination and thereafter intimidated Plaintiffs with many meetings, allowing Steve Wynn to present himself along with security and supportive high-level executives, and issuing memos signaling corporate support for Steve Wynn.  Examples of Wynn Resorts' retaliatory conduct includes but is not limited to:

- The January 17, 2018 pre-shift meeting featuring Maurice Wooden and Troy Mitchum, where they made it clear that Wynn Resorts did not want employees speaking up about their workplace experiences;

- The January 31, 2018 Memo by Wynn Las Vegas President Maurice Wooden, was, in the opinion of Plaintiffs and their co-workers, threatening and thereby retaliatory, designed to stifle the speech of any Wynn Resorts employees (including Plaintiffs) who had been subjected to abusive conduct by Steve Wynn in years past and/or knew or suspected that many of their Salon or Spa co-workers had been his victims as well.

- The January 31, 2018 Wynn Country Club meeting conducted by Steve Wynn and Maurice Wooden., where Salon employees were forced to attend and endure Steve Wynn's ridiculing of employees who had spoken about his misconduct to the media or who had corroborated the accounts of others;

- The February 1, 2018 Salon birthday celebration, personally attended by Steve Wynn (not a usual occurrence) with a camera crew, where he joked about the misconduct allegations against him, kissed a female employee, hugged other employees without their consent, and where Salon Director Claude Baruk told Salon employees that they "needed" to record a statement saying Steve Wynn never harassed them;

105.  Even after Steve Wynn alleged gave up some of his power in the workplace, workplace, the retaliation continued for Plaintiffs, exemplified but not limited to:

- The February 15, 2018 pre-shift meeting, where two Wynn executives told Salon employees they should only speak to Massachusetts Gaming Commission or the Nevada Gaming Control Board about misconduct – and no one else;

- The two town hall meetings conducted by Steve Wynn protégé and enabler Matt

Maddox, on March 14, 2018 and then later on May 8, 2018;

- Surprise and forced interviews with Gibson Dunn investigators retained by Wynn Resorts' Board of Directors, as arranged by Salon Director Claude Baruk who was understood by Salon employees to be in constant contact with Steve Wynn, who was still residing in his private villa at the Wynn hotel; and

- Continued visits from Wynn Resorts executives, attorneys and Board members to the Salon, where some questioned Salon employees (including Plaintiffs) about their experiences.

106.    The 1/31/18 issuance and posting of Wynn Las Vegas President Maurice Wooden's memo was especially threatening and thus retaliatory. It was designed to chill and stifle the speech of Wynn Resorts employees (including Plaintiffs) who had experienced abusive conduct by Steve Wynn and/or knew or suspected that some of their Salon or Spa co-workers had been his victims as well.

107.    Plaintiffs engaged in protected conduct when they accessed the EEOC process. Some plaintiffs, and others, were then questioned by Wynn Resorts HR personnel about their filings, HR personnel who were perceived as being people who had knowledge of past misconduct and the termination/payoffs to Steve Wynn victims, all employed in an HR department headed by Troy Mitchum, the son of Steve Wynn's long-time personal assistant (a person believed to have had contact with Plaintiffs and other female employees booked to provide Steve Wynn services.)

108.    Defendants' aforementioned actions and conduct would reasonably chill and deter the Plaintiffs and other employees from raising concerns about discrimination or otherwise engaging in protected conduct.  Thus, the cumulative effect of Defendants' actions constitutes illegal retaliation which is prohibited by federal and state statutes.

109.    Defendants' conduct, through the actions and omissions of its high-level executives and Board members, also constitutes retaliatory harassment and the creation of an illegally hostile retaliatory work environment which harmed these Plaintiffs, even to the present time.

110.    In the Massachusetts gaming enforcement action, to salvage its licensing status, Wynn Resorts admitted to taking "full responsibility" for the "failures of several former executives to respond appropriately to complaints against [Steve] Wynn," which left "many of the victims . . .

powerless and without a voice." Taking "full responsibility" apparently did not include Defendants fully complying with Title VII by making the victims of Defendants' discrimination whole and compensating victims for their economic and compensatory damages. This was made clear in the Massachusetts gaming proceedings where Defendants only promised future actions, never mentioning remedying the past. Defendants' failure to do so constitutes retaliation against those victims, first forcing them to be part of an ineffective EEOC process, then settling in secret with the EEOC, and now forcing these current employees to file a public suit to secure their statutory remedies.

111.   There may be more detrimental acts about which Plaintiffs are unaware which may also constitute retaliation in that it harmed the Plaintiffs in their workplace.

112.   Plaintiffs continue to fear retribution and retaliation from Defendants, who, they feel, have not done enough to assure them that  (a) Steve Wynn was wrong; (b) they, truthful complaining victims, will be protected in the future, including from possible actions by Steve Wynn and his powerful allies in the gaming and hotel industry;

113.   Additional acts of retaliation include the following: Defendants' failure to craft a remedial mechanism to evaluate and compensate the plaintiffs for unlawful discrimination in a respectful, dignified, private way, as requested by Plaintiffs, and forcing Plaintiffs to secure the remedy they are entitled to under Title VII by having to file this public lawsuit with the possibility of their identities and lurid accounts of the abuse they suffered being publicly disclosed.

114.   Additional, as yet unknown acts of retaliation may also exist, as evidenced by the revelations and admissions during the Massachusetts Gaming Commission hearings on April 2, 3 and 4, 2019, that back in 2018, some Salon employees were secretly surveilled by Defendants. This has caused anxiety and fear in Plaintiffs that they were the target.

115.   Plaintiffs have been seriously harmed by this unlawful retaliation and they are entitled to be fully compensated and made whole, including any and all economic damages they may have suffered when Defendants' actions (meetings, etc.) reduced the amounts they were able to earn and compensatory damages for emotional distress and disturbance (under Title VII).

116.   As more fully set forth in their injunctive relief claim, Plaintiffs also seek relief and the necessary workplace evaluation for the implementation of effective anti-discrimination measures

1  to ensure the safety and protection of all employees, and that Defendants follow lawful employment

2  practices and that Plaintiffs are fully protected from retaliation in the future.

3      117.   Under applicable federal law, Plaintiffs are also entitled to recover all of their

4  attorneys' fees and costs, and to secure the injunctive relief pled more specifically below.

5  **THIRD CLAIM FOR RELIEF**

6  **Negligent Hiring, Training, Supervision, and Retention of High-Level Executives and Human**

7  **Resources Personnel**

8      118.   Plaintiffs repeat and reallege each and every allegation of the proceeding paragraphs

9  of this Complaint as though fully set forth herein and incorporate the same by reference.

10      119.   Defendants owed Plaintiffs, and each of their employees, a duty to hire, train,

11  supervise, and retain only those individuals who were and remained fit and competent to perform their

12  job.

13      120.   Defendants failed to do so by hiring incompetent, unqualified, poorly trained

14  executives and human resources personnel, who failed to prevent Steve Wynn's sexual harassment,

15  who failed to investigate and remedy it after numerous occurrences, and who put each of the Plaintiffs

16  and their female co-workers at risk.

17      121.   Further evidence of Defendants' negligence is found in the Massachusetts Gaming

18  Commission *Investigative Report,* and in the evidence submitted by Defendants, from which the

19  Commission expressed its unanimous concern that, among failures to act by others, that Matt Maddox

20  "routinely failed to exercise the proper diligence, express the requisite level of concern, and

21  understands the magnitude of the risk and legal implications associated with much of the information

22  of which he was, or should have been, aware."

23      122.   Defendants were responsible for the well-being of Salon employees (including

24  Plaintiffs) while they were working and to ensure, among other things, that anti-discrimination laws

25  were obeyed and enforced.

26      123.   Defendants, as sophisticated employers, were negligent in hiring, training, and

27  supervising human resources staff and high-level executives who created or allowed complaints or

28  observations by others about Steve Wynn's sexually harassing and predatory conduct towards

1    employees to go uninvestigated and not remedied for many years, and then happen again (and again.)

2        124.    Defendants allowed Steve Wynn to use his power and authority to staff these positions

3    with persons who would insulate and protect him from the consequences of his misconduct, or turn

4    those matters over to him and his personal attorneys to pay off and conceal, as disclosed in the 3/15/19

5    Massachusetts Gaming Commission *Investigative Report.*

6        125.    Defendants' negligent hiring, training, supervision, and retention of high level and

7    human resources staff constitutes a failure and breach of their employer duty. This includes, **but is**

8    **not limited to,** allowing Steve Wynn to have unfettered access to female employees, either at the

9    Salon or in the privacy of his office or Wynn villa, by failing to recognize the pattern of his sexual

10   predation over many years, by failing to act to prevent it from recurring and then by making public

11   proclamations of support for Steve Wynn (in letters, memos and in meetings) in response to the media

12   reports of his misconduct.

13       126.    Defendants' negligent hiring, training, supervision, and retention of its high level and

14   human resources staff also includes their awareness and collective failure to act on the dangerous

15   situation arising when Wynn Resorts employees were required to provide in-room services for hotel

16   guests. With the Salon earning double the fees for in-room services, Defendants breached their duty

17   by placing Salon employees in vulnerable and unsafe situations where they were being subjected to

18   abusive guests, including those who were using or offering drugs, who were in various states of nudity,

19   and who engaged in sexual acts during their services or propositioned Salon employees.

20       127.    As a direct and proximate result of Defendants' aforementioned negligent actions,

21   Plaintiffs have sustained injuries, including mental anguish, in a sum in excess of $15,000.00.

22       128.    As a direct and proximate result of Defendants' actions, Plaintiffs have had to engage

23   the services of an attorney, incurring attorney's fees and costs to bring this action, which they should

24   be entitled to recover.

25   **FOURTH CLAIM FOR RELIEF**

26   **Intentional Infliction of Emotional Distress**

27       129.    Plaintiffs repeat and reallege each and every allegation of the proceeding paragraphs

28   of this Complaint as though fully set forth herein and incorporate the same by reference.

130.     In allowing the years of sexual predation by founder/owner/operator Steve Wynn, Defendants, as employers, conducted their business in an extreme and outrageously dangerous manner with either the intention of, or reckless disregard for, causing emotional distress injury to many employees, when those employees were either his direct victims, the fear and anxiety his actions instilled that they might be his next victim, or having to witness the effect of his misconduct on their co-workers.

131.     It was extreme and outrageous for Defendants to tolerate Steve Wynn's misconduct (sexual predation) for so long, and then when it is exposed in the national media, to initially deny it (without a factual basis for doing so), to proclaim corporate support for Steve Wynn, to allow him to conduct and lead meetings with Salon employees, and to allow him to intimidate them from speaking the truth about the sexual harassment they were subjected to by him, all of which was enabled by Defendants.

132.     It was extreme and outrageous for Defendants to have Matt Maddux conducting town hall meetings with the Salon employees both during and after the time that Maddox was personally under investigation for his failure to recognize and rectify the hostile and illegal work environment created by years of Steve Wynn's misconduct.

133.     It was extreme and outrageous for Wynn Resorts to allow Steve Wynn to attend an employee birthday party and bring a camera crew, and use this occasion to intimidate Salon employees, to allow Salon Director Claude Baruk to pressure Salon employees into recording laudatory comments from Salon employees (many of whom are direct victims of Steve Wynn's sexual abuse and misconduct), or force them to make positive statements about Steve Wynn and claim that Steve Wynn has never assaulted or harassed them.

134.     It was extreme and outrageous to force Salon employees to be interviewed on hotel property, allow it to be arranged by their Salon Director Claude Baruk, a close ally of Steve Wynn, and alerting them (Baruk and Wynn) as possible victims and then subjecting them to interrogation about their experiences as victims of Steve Wynn's abuse without taking adequate and enforceable step to guarantee their safety and protection.

135.     Defendants either intended, or acted with reckless disregard, about whether their

1  actions would cause emotional distress to Plaintiffs.

2        136.   As a direct and proximate result of Defendants' extreme and outrageous conduct, each

3  of the Plaintiffs did suffer severe or extreme emotional distress in a sum in excess of $15,000.00.

4        137.   Additionally, Defendants' actions are so highly offensive to a reasonable person,

5  suggestive of an intent to impede legitimate claims to be made by Plaintiffs and others, obstructing

6  gaming enforcement investigations, so to be outrageous and malicious, entitling Plaintiffs to recover

7  punitive damages in an amount to be determined at trial sufficient to punish and deter Defendants.

8        138.   As a direct and proximate result of Defendants' actions, Plaintiffs have had to engage

9  the services of an attorney, incurring attorney's fees and costs to bring this action, which they should

10  be entitled to recover.

11                                **FIFTH CLAIM FOR RELIEF**

12                                    **Invasion of Privacy**

13        139.   Plaintiffs repeat and reallege all preceding paragraphs as though fully set forth herein.

14        140.   Plaintiffs had an actual and reasonable expectation of seclusion and some privacy in

15  their workplace, and the protection of information they had disclosed to Defendants as their employer.

16        141.   Defendants, as employers who necessarily collect some private information about

17  employees, allowed or gave Steve Wynn access to private information about employees, including

18  but not limited to their private cell phone numbers and work schedules (allowing him, for example,

19  to schedule his salon services with his next victim.)

20        142.   The meetings which Defendants convened after the publications of the *Wall Street*

21  *Journal* articles which Defendants required Salon employees, including Plaintiffs, to sit through

22  intruded on their seclusion and thus constitutes an invasion of their privacy.

23        143.   The February 1, 2018 filming incident in the Salon was coercive and personally

24  invasive, making Salon employees feel like if they said no to being filmed, they would suffer

25  consequences or be punished.  It seemed to some employees that Salon Director and Steve Wynn-ally

26  Claude Baruk was targeting specific Salon employees, suggesting he knew which of them were most

27  likely to have been Steve Wynn's victims.

28        144.   The February 1, 2018 filming incident also invaded the privacy of Salon employees

1   who had no desire to have their image recorded for Wynn Resorts' use, nor have them cast in a false

2   light by making it seem that they were supporting Steve Wynn and vouching that he had not done the

3   things being reported in the media. Defendants invaded their privacy by forcing some employees to

4   provide an on-camera interviews (showing faces and disclosing their identities) claiming that Steve

5   Wynn never assaulted or harassed them, which for some was simply not true.

6       145.    Plaintiffs' expectation of seclusion and some level of privacy in the workplace was

7   objectively reasonable.

8       146.    Defendants intentionally intruded upon Plaintiffs' seclusion and expectation of privacy

9   by pressuring Salon employees to make an on-camera statements in support of Steve Wynn, knowing

10  this would be used to potentially aid Wynn Resorts and/or Steve Wynn in future litigation or the

11  ongoing gaming enforcement investigations.

12      147.    Additional invasions of privacy may also have occurred. During the Massachusetts

13  Gaming Commission hearings on April 2, 3 and 4, 2019, Defendants disclosed that that back in 2018,

14  some Salon employees, past and present, were secretly surveilled by Defendants.  This has caused

15  anxiety and fear in Plaintiffs that they, or persons in whom they confided, were the target.

16      148.    Defendants' actions are highly offensive to a reasonable person because of their

17  intrusive nature, the context in which those actions were undertaken, with intentional or reckless

18  disregard so as to indicate that Defendants' motives were to circumvent a proper investigation by

19  Massachusetts and Nevada gaming enforcement authorities and to unfairly secure defensive but

20  deceptively false evidence for use in future litigation.

21      149.    As a direct and proximate result of Defendants' actions, Plaintiffs have suffered

22  damages, including mental anguish, in a sum in excess of $15,000.00.

23      150.    Additionally, Defendants' actions are so highly offensive to a reasonable person,

24  suggestive of an intent to impede legitimate claims to be made by Plaintiffs and others, obstructing

25  gaming enforcement investigation and so to be outrageous and malicious, entitling Plaintiffs to

26  recover punitive damages in an amount to be determined at trial sufficient to punish and deter

27  Defendants.

28      151.    As a direct and proximate result of Defendants' actions Plaintiffs have had to engage

1   the services of an attorney, incurring attorney's fees and costs to bring this action, which they should
2   be entitled to recover.

### REQUEST FOR INJUNCTIVE RELIEF

#### Injunctive Relief under State and Federal Anti-Discrimination Statutes

5   152.   Plaintiffs repeat and reallege each and every allegation of the proceeding paragraphs
6   of this Complaint as through fully set forth herein and incorporate the same by reference.

7   153.   Pursuant to 42 U.S.C. § 2000e *et seq*. and Nevada law, Plaintiffs also seek injunctive
8   relief requiring Defendants to immediately correct all discriminatory and retaliatory practices and take
9   all appropriate steps to ensure that Plaintiffs and all other persons similarly situated are afforded a
10  workplace free of all forms of unlawful discrimination of any kind.

11  154.   Some of the Plaintiffs watched, listened to or have now read reports of the
12  representations of corrections to the workplace made by Defendants in the Massachusetts Gaming
13  Commission hearings on April 2, 3, and 4, 2019. They have seen some of these corrective actions
14  unfold in their workplace, and find most of them to be ineffective, including those related to making
15  complaints, those about providing Salon services to executives and those concerning  in- room
16  services to guests and because some of the key people remain in control of these processes, especially
17  in human resources. They believe not enough attention was paid to their perspective, as front-line
18  employees who were or saw years of sexual predation by Steve Wynn, facilitated, tolerated, paid for
19  and covered up by Defendants' high level executives and human resources.

20  155.   As a large and allegedly sophisticated employer which has now been shown to have
21  tolerated years of sexual harassment of female employees by its founder and owner, Plaintiffs ask that
22  Defendants be required to engage the services of **outside**, independent, highly competent, qualified
23  expert consultants to fully study the workplace culture which led to this injurious and hostile situation
24  and allowed it to fester and continue for so many years, and which, in each Plaintiff's individual
25  opinion, has not been fully remedied.

26  156.   Thereafter, Defendants should then be required to create and implement an effective
27  anti-harassment and anti-discrimination program, including policies, training (prevention) and
28  complaint procedures which work and do not inflict further damage on victims. Additionally,

1 | Defendants should then develop a means by which to evaluate the effectiveness of these measures and

2 | adjust and adapt where needed or advisable to fully protect employees.

3 | **PRAYER FOR RELIEF**

4 | WHEREFORE, Plaintiffs JUDY DOE NO. 1, JUDY DOE NO. 2, JUDY DOE NO. 3, JUDY

5 | DOE NO. 4, JUDY DOE NO. 5, JUDY DOE NO. 6, JUDY DOE NO. 7, JUDY DOE NO. 8, AND

6 | JUDY DOE NO. 9 pray for judgment against Defendants, and each of them, as follows:

7 | 1. For all damages Plaintiffs are entitled to recover under Title VII and the Nevada anti-

8 | discrimination statutes;

9 | 2. For general damages sustained by each Plaintiff in an amount in excess of $15,000.00;

10 | 3. For special damages sustained by each Plaintiff in an amount in excess of $15,000.00;

11 | 4. For punitive damages in an amount to be determined at trial;

12 | 5. For injunctive relief as set forth above;

13 | 6. For reasonable attorneys' fees and costs of suit;

14 | 7. For interest at the statutory rate, and

15 | 8. For such other relief as the Court deems just and proper.

16 | DATED this 30th day of September, 2019.

17 | Respectfully submitted,

18 | GILBERT & ENGLAND LAW FIRM

19 |

20 | KATHLEEN J. ENGLAND, ESQ.
Nevada Bar No. 206

21 | 610 South Ninth Street
Las Vegas, Nevada 89101

22 | JASON R. MAIER, ESQ., NV BAR NO. 8557
JOSEPH A. GUTIERREZ, ESQ., NV Bar No. 9046

23 | DANIELLE J. BARRAZA, ESQ., NV BAR No. 13822
**MAIER GUTIERREZ & ASSOCIATES**

24 | 8816 Spanish Ridge Avenue
Las Vegas, Nevada 89148

25 |

26 | *Attorneys for Plaintiffs Judy Doe No. 1,*
*Judy Doe No. 2, Judy Doe No. 3, Judy*

27 | *Doe No. 4, Judy Doe No. 5, Judy Doe*
*No. 6, Judy Doe No. 7, Judy Doe No. 8*

28 | *and Judy Doe No. 9*

30

# EXHIBIT "1"



LAS VEGAS

January 26, 2018

To All Employees,

You may have heard news reports today about allegations of sexual harassment directed at Mr. Wynn. Those news stories are part of the latest litigation strategy led by Elaine Wynn, who has been involved in lawsuits against Mr. Wynn and our company since 2011.

We are all supportive of Mr. Wynn and his leadership, and while it is unfortunate that the news media has been used to assail Mr. Wynn and us in this way, we are doing everything we can to protect our employees from these types of attacks and publicity.

We remain steadfast in maintaining the safe and respectful culture that has made us the employer of choice for our 23,000 fellow employees worldwide.

Maurice Wooden