KATHLEEN J. ENGLAND, ESQ.
Nevada Bar No. 206
**GILBERT & ENGLAND LAW FIRM**
610 South Ninth Street
Las Vegas, Nevada 89101
Telephone:     702.529.2311
E-mail:        kengland@gilbertenglandlaw.com

JASON R. MAIER, ESQ.
Nevada Bar No. 8557
JOSEPH A. GUTIERREZ, ESQ.
Nevada Bar No. 9046
DANIELLE J. BARRAZA, ESQ.
Nevada Bar No. 13822
**MAIER GUTIERREZ & ASSOCIATES**
8816 Spanish Ridge Avenue
Las Vegas, Nevada 89148
Telephone: 702.629.7900
Facsimile:  702.629.7925
E-mail:     jrm@mgalaw.com
            djb@mgalaw.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

### DISTRICT OF NEVADA

| | |
|---|---|
| JUDY DOE NO. 1, an individual; JUDY DOE NO. 2, an individual; JUDY DOE NO. 3, an individual; JUDY DOE NO. 4, an individual; JUDY DOE NO. 5, an individual; JUDY DOE NO. 6, an individual; JUDY DOE NO. 7, an individual; JUDY DOE NO. 8, an individual; and JUDY DOE NO. 9 an individual, Plaintiffs, <br><br> v. <br><br> WYNN RESORTS, LIMITED, WYNN LAS VEGAS, LLC, , Defendants. | Case No.:  2:19-cv-01904-GMN-VCF <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANT WYNN LAS VEGAS, LLC'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT** <br><br> **HEARING REQUESTED** |

       The nine JUDY DOEs Nos. 1-9 ( "Plaintiffs"), hereby oppose Defendant Wynn Las Vegas,

LLC's ("Wynn Las Vegas") motion to dismiss Plaintiffs' Second Amended Complaint [ECF No.

115].  This opposition is based on the following memorandum of points and authorities, the pleadings

and papers on file, the attached exhibits, and any oral argument the Court entertains.

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.        INTRODUCTION**

The nine Judy Does Plaintiffs filed suit against two named Wynn corporate entity employers (the "Wynn Defendants"). Six Judy Doe Plaintiffs remain employed at the Wynn Salon and Encore Salon (the "Salon"). <u>All</u> are currently working in the Las Vegas beauty/salon industry. This suit arises out of an employer's obligation and failure to provide a safe, discrimination-free and retaliation-free workplace. These Judy Doe Plaintiffs are among the many employee-victims of Steve Wynn's predatory misconduct in years past and their employer's more recent acts and omissions when that misconduct was publicly exposed in the media.

The corporate Wynn Defendants already secured dismissal at the pleading stage once before. On 7/15/20, the district court dismissed Plaintiffs' First Amended Complaint without prejudice, but also ruled that the "deficiencies in the Plaintiffs' complaint may be cured." ECF No. 81 at p. 11, lines 1-3. However, judgment was entered that day, precluding any deficiency-curing amendment. ECF No. 82. Following a successful appeal to the Ninth Circuit, this case was remanded. The Judy Doe Plaintiffs filed a Second Amended Complaint on February 2, 2022. ECF No. 106.

The Second Amended Complaint contains 402 paragraphs of factual allegations substantiating Plaintiffs' Title VII and state law claims for sexual harassment, hostile work environment, retaliation, and state tort claims for negligent hiring, training, supervision, and retention, intentional infliction of emotional distress, false imprisonment, and invasion of privacy, and request for injunctive relief. The Second Amended Complaint addresses and cures all deficiencies noted in the dismissal order.

Nevertheless, Defendant Wynn Las Vegas, LLC has filed yet another motion to dismiss [ECF No. 115], joined by Defendant Wynn Resorts, Limited [ECF No. 119]. The motion disingenuously claims that the Plaintiffs' hostile work environment and sexual harassment allegations "improperly pursue recovery based on time barred allegations of conduct by Steve Wynn going back to 2004." ECF No. 115 at p. 1. This is not true. The Plaintiffs have provided an accurate history of the despicable harassment they endured working at the Wynn and Encore Salons, and have explained how the harassment and hostility worsened <u>after</u> the *Wall Street Journal* and other media detailed Steve Wynn's longtime misconduct in January 2018. The Wynn Defendants do acknowledge that the continuing action theory exists, but claim the Judy Doe Plaintiffs are using it to "resurrect ancient time barred allegations," which is also not true. ECF No. 115 at p. 1.

The Plaintiffs are using background facts to explain exactly why they contend that the actions and omissions of their employer in 2018 were so injurious to them, as Wynn employees, when Steve Wynn's misconduct was exposed and why that situation constitutes an illegal hostile work environment and retaliation in violating Title VII and Nevada law. All Judy Doe Plaintiffs are well aware that female employees who spoke out about being victimized by Steve Wynn ended up disappearing from the Wynn workplace. ECF No. 106 at ¶ 318. This is exactly why the intrusive January 2018 mandatory meeting at the Wynn Country Club (where Steve Wynn demanded that victims "out" themselves) was so traumatizing and hostile for them, as well as the incessant town hall meetings from Steve Wynn protégé Matt Maddox and the pressure-inducing interrogations from agents of the Wynn Resorts Board. The Judy Doe Plaintiffs' history as prior victims, combined with the fact that they know bad things happened to Steve Wynn's victims, all contributed to the hostile and retaliatory nature of the events that took place in **2018** – which is what this case is about, not "ancient history." Similarly, the tort claims pled under Nevada state law are based on events that occurred in 2018, and none are preempted by other statutory law.

Instead of acknowledging the sufficiency of Plaintiffs' Second Amended Complaint, the Wynn Defendants consistently cite to cases decided on summary judgment or following trial in arguing that the Plaintiffs have not submitted evidence to support their claims. This case is merely at the pleading stage, and these Plaintiffs should not be required to go beyond the *Twombly/Iqbal* pleading standard. Accordingly, this Court should deny Wynn Las Vegas, LLC's motion to dismiss in its entirety [ECF No. 115], as well as Wynn Resorts, Ltd.'s joinder [ECF No. 119].

## II.    STATEMENT OF FACTS AS ALLEGED IN THE SECOND AMENDED COMPLAINT

The following plausible and well-pleaded facts summarized below must be construed as true per *Ashcroft v. Iqbal*, 556 U.S. 662 (2009):

The nine Judy Doe Plaintiffs are longtime employees of Wynn Resorts who have worked at the Wynn Salon and/or Encore Salon; six still do. ECF No. 106 at ¶ 27. This discrimination and tort case is being asserted against two Defendant-employers, Wynn Resorts Limited and Wynn Las Vegas, LLC and arises out of Defendants' high-level executives enabling, facilitating, and covering up

decades of wrongful, abusive sex-based Steve Wynn misconduct in their Wynn Resorts workplace. *Id.* at ¶ 28. This included Steve Wynn's using this workplace as his personal hunting ground, repeatedly subjecting female employees to sexual harassment. *Id.* at ¶ 28.

Plaintiffs knew that Steve Wynn chose and preyed upon specific female employees for a while, tired of them, and moved to his next victim. Plaintiffs and their female Salon co-workers lived in fear of his attention and being required to provide him services. *Id.* at ¶ 283. Every Judy Doe Plaintiff suffered similar but individualized acts of sexual harassment and personal degradation by Steve Wynn, over a period of time, which made each of them more vulnerable to the abhorrent corporate actions that took place in 2018 after the media exposed Steve Wynn's wrongdoing. *Id.* at ¶ 97-274.

Upon learning of the imminent publication of media reports, on January 17, 2018, Wynn Resorts convened a meeting of Salon employees where Maurice Wooden (President of Wynn LV) and Troy Mitchum (VP of Human Resources of Wynn Resorts, Limited, and son of Steve Wynn's longtime assistant Cindy Mitchum). They announced that Wynn Resorts knew reporters were contacting employees and said that no one should talk to reporters. *Id.* at ¶¶ 32-34.

On January 26, 2018, numerous national media outlets, including the *Wall Street Journal*, published explosive reports about years of Steve Wynn's misconduct at his hotels, his abuse of power, and his committing sexual harassment against many employees, but especially targeting Salon and Spa female employees who were required to provide him services. *Id.* at ¶ 35.

That same day, January 26, 2018, Wynn LV President Maurice Wooden issued a memo proclaiming that Wynn Resorts was "supportive" of Steve Wynn and his leadership. *Id.* at ¶ 33. This memo shocked and dismayed many Salon employees, who knew of Steve Wynn's wrongdoing (either personally experiencing it or hearing of co-workers' experiences or both), past cover-ups, and rumored payoffs to victims, which had stifled them from coming forward with their own stories. *Id.* at ¶ 36. The Wooden memo was posted in Plaintiffs' Salon workplace. **Exhibit 1**. *See also*, **Exhibit 2**, 3/15/19 at 00157-0164 detailing events and corporate responsibility.

This media exposure triggered investigations by the Massachusetts Gaming Commission and Nevada gaming authorities. *Id.* at ¶ 38. The Wynn Defendants called another Salon employee meeting at the Wynn Country Club, where Steve Wynn ridiculed those who had made the sexual

harassment allegations and asked Salon workers who felt harassed to "out" themselves.  *Id.*, ¶ 39-41.

On February 1, 2018, Steve Wynn visited the Salon for an employee birthday celebration, joked about the misconduct allegations, kissed employees, and hugged others.  At this event, Salon Director Claud Baruk asked Salon employees to be videotaped denying that Steve Wynn ever assaulted or abused them.  *Id.* at ¶¶ 42-47.

On 2/6/2018, Steve Wynn resigned from his positions as chairman and CEO of Wynn Resorts but continued to live at The Wynn.  *Id.* at ¶ 48.   That same day, the Wynn Resorts Board of Directors issued a statement accepting Steve Wynn's resignation "with a heavy heart," calling him a "beloved leader" whose world class team of executives would "continue" on in his stead. *Id.* at ¶ 49.

On 2/15/2018, Defendants' legal counsel and another individual met with Salon employees and handed out cards with the numbers of the Nevada Gaming Control Board and Massachusetts Gaming Commission, telling the Salon employees that these were the only people to talk to, which made the employees fear retaliation if they reported complaints or bad experiences.  *Id.* at ¶51.

In March 2018, Wynn Resorts arranged, through Salon Director Claud Baruk, mandatory meetings with Wynn Resorts' "investigatory counsel" (Gibson, Dunn), the second law firm retained by Wynn Resorts' Board  to investigate. *Id.* at ¶ 52.  Mr. Baruk was the long-time personal hairstylist of Steve Wynn's wife Andrea Wynn, and believed to be in daily contact with Steve Wynn.  *Id.* at ¶ 52.  The interviews were conducted at the property itself. *Id.* at ¶ 53.  These requests and Baruk's involvement scared employees, and took Salon employees away from paying customers and impacted their earnings.  *Id.* at ¶ 53.

From Plaintiffs' perspective, little was done to protect the employees being summoned from possible retribution.  They were given nothing in writing assuring them or proving the legitimacy and independence of the Gibson Dunn investigation.  *Id.* at ¶ 54.

On March 14, 2018, Wynn Resorts convened another meeting with Salon employees, conducted by Wynn Resorts CEO Matt Maddox, who said he was "taking over."  Mr. Maddox was widely perceived as Steve Wynn's hand-picked successor, and part of the problem of enabling or covering up Steve Wynn's past misconduct in the Wynn workplace. *Id.* at ¶ 55.

On March 23, 2018, Wynn Resorts Board Member Patricia Mulroy issued a letter to

employees, posted in the Salon, asking persons aware of sexual harassment allegations to report the information to the Board's investigators.  Due to media reports, Salon employees (including Plaintiffs) were concerned that the Board's investigation was not independent, fair or honest, and that the investigating law firm had connections with long-time General Counsel Sinatra, Steve Wynn's  close confidante. *Id.* at ¶ 56.  Salon employees were forced to acknowledge receipt of this Mulroy letter on the computerized employee portal, leading them to feel targeted. *Id.* at ¶ 58.

In 2018, the Mass Gaming Commission and the Nevada Gaming Control Board conducted extensive investigations into Wynn Resorts, its Board members, and executives.  Steve Wynn sued the Massachusetts Gaming Commission and its Director of Investigation.  *Id.* at ¶ 54.

On May 8, 2018, Wynn Resorts conducted another meeting with Salon employees, again featuring Wynn Resorts CEO Matt Maddox.  Employees did not trust Mr. Maddox because he was so closely allied with Steve Wynn.  *Id.* at ¶ 61.

On February 26, 2019, the Nevada Gaming Control Board fined Wynn Resorts $20 million, the highest fine ever assessed in Nevada, for Wynn Resorts' failure to investigate claims by many women that they had been sexually harassed in the Wynn workplace by Steve Wynn, and the handling of those matters. *Id.* at ¶ 68.

On April 2, 2019, the Mass Gaming Commission released its "*Investigative Report*" dated 3/15/19.  This *Investigative Report* found that over a course of years, "a limited group of executives and employees in positions of authority at [Wynn Resorts], including in the legal division, disregarded Company policies when it came to certain allegations of sexual misconduct against [Steve] Wynn involving employees." *Id.* at ¶ 69-70.  It also concluded that "certain executives, with the assistance of outside counsel, took measures to conceal allegations against [Steve Wynn] that came to their attention."  *Id.* at ¶ 71.  And that Wynn Resorts' corporate failures are "significant, repetitive, and reflective of the Company's historical governance practices," as there was a "culture where employees were reluctant to report allegations against [Steve] Wynn to management."  *Id.* at ¶ 72.

On April 2, 3, and 4, 2019, the Mass Gaming Commission ("MGC") conducted Adjudicatory Hearings. On 4/2/19, Wynn Resorts President and CEO Matt Maddox testified to how he first supported Steve Wynn and only later came to believe the truth about Steve Wynn's misconduct:

> "As those investigations began, the denial changed and I began to realize that there were many victims and those victims felt powerless, and for that I'm deeply remorseful.  They felt they didn't have a voice, that if they were to speak up, they would be retaliated against, or if they did it, it wouldn't be investigated, and for that I'm truly sorry."

MGC Adjudicatory Hearing Transcript, 4/2/19, 29:5-12.  *Id.* at ¶ 74, citing to Ex. 6.  On April 4, 2019, President and CEO Matt Maddox testified that Wynn Resorts had allegedly implemented a new and "enhanced" sexual harassment policy.  When asked, Mr. Maddox was unable to articulate any enhancements.  *Id.* at ¶ 77.

On April 8, 2019, Wynn Resorts submitted its Post-Hearing Brief to the MGC, in which Wynn Resorts admitted to being "responsible for those mistakes," and to a lack of proper corporate response to employees' sexual harassment complaints against Steve Wynn.  Wynn Resorts took "full responsibility" for the "failures of several former executives to respond appropriately to complaints against [Steve] Wynn," which had created "many …victims . . . ."[1]  *Id.* at ¶ 80; 326.

On April 30, 2019, the Massachusetts Gaming Commission released its "Decision and Order" about Wynn Resorts, based on their year-long investigation.  They imposed a $35 million fine on certain conditions, including training for Maddox.  *Id.* at ¶ 81 (**Exhibit 3**, Decision and Order).

In 2018, high-level Wynn Resorts executives and Board members continued to use the services of Salon employees (including Plaintiffs). In doing so, they have made startling inquiries of employees which are unnerving.  *Id.* at ¶ 84.  Defendants never constructed a way to remedy and pay for the harm years of abuse, misconduct and corporate cover up have inflicted on many Wynn Resorts employees, past and present, Plaintiffs included.  *Id.* at ¶ 85.

Thus, Plaintiffs' Second Amended specifically details instances of sexual harassment and hostile work environment (*Id.* at ¶ 97-308), and discrete instances of retaliation the Plaintiffs suffered shortly **_after_** they accessed the EEOC process in March 2018 (*Id.* at 321-331).  At issue in this suit will be whether events such as the pre-shift meeting discouraging employees from complaining internally or to reporters; the January 2018 Steve Wynn-led Country Club meeting intimidating employees (including Plaintiffs) from speaking out about misconduct; the 2/1/18 Salon birthday party

---

[1] This apparently did not include addressing the obvious Title VII and tort claims those employees might have.

1  and the pressure on employees (including Plaintiffs) to go on camera and say nice things about Steve

2  Wynn; and whether the Wynn Resorts Board's investigation gave rise to  a hostile work environment

3  under federal and state law, which was followed by <u>retaliation</u> in the form of additional town hall

4  meetings  in March and May of 2018, forced interviews with investigators retained by Wynn Resorts'

5  Board, and continued visits from Wynn executives, attorneys, and Board members to the Salon, where

6  the Plaintiffs were questioned about their experiences.  Title VII's retaliation protection is broader

7  than that discrimination, as retaliation is not limited to employer's actions that affect terms, conditions,

8  or status of employment, with the central question being whether a reasonable employee could be

9  dissuaded from engaging in protected conduct as a result of the employer's actions. *Burlington N. &*

10 *Santa Fe Ry. Co. v. White*, 548 U.S. 53, 54, (2006).

11     Plaintiffs accessed the confidential EEOC proceedings.  The EEOC immediately disclosed

12 their identities to the Wynn corporate Defendants and then later provided the detailed Charges. *Id.* at

13 ¶¶ 20-26.  Plaintiffs provided detailed accounts of their interactions with Steve Wynn from 2004 (for

14 some) <u>to and through 2018 </u>and his acts of predation, why they didn't report it, and why they felt

15 humiliated, shamed and retaliated against after the *Wall Street Journal* article was first published on

16 January 26, 2018. *Id.* at ¶ 287.  In June-July 2019, the Wynn Resorts entered into a secret settlement

17 with EEOC from which the Plaintiffs were excluded and not a party to.  *Id at* ¶ 24.

**III.     LEGAL ANALYSIS**

    **A.     LEGAL STANDARD FOR MOTION TO DISMISS**

20     A Rule   12(b)(6)   motion to dismiss tests   the   legal   sufficiency   of   claims.   FRCP

21 12(b)(6); *Navarro v. Block,* 250 F.3d 729, 731 (9th Cir. 2001).  Under FRCP 8(a)(2), a pleading need

22 only  contain a "short and plain statement of the claim showing that the pleader is entitled to relief."

23 Particularity is required only for those actions involving  fraud or mistake. FRCP 9(b). The complaint

24 need only  give defendant "fair notice of what the claim is and the grounds upon which it rests." *Bell*

25 *Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (internal quotation and modification omitted).  The

26 court must accept all factual allegations pleaded  as true and  construe them and draw all reasonable

27 inferences from them in favor of the nonmoving party. *Cahill v. Liberty Mutual Ins. Co.,* 80 F.3d 336,

28 337–38 (9th Cir.1996).

The complaint must be supported by factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "While legal conclusions can provide the framework of a complaint," neither legal conclusions nor conclusory statements are themselves sufficient, and such statements are not entitled to a presumption of truth. *Id.* at 1949–50. The complaint need not contain detailed factual allegations, rather, it must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570 (2007). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft,* 556 U.S. at 678 (2009) (citing *Twombly,* 550 U.S. at 556).

*Iqbal* and *Twombly* prescribe a two-step process for evaluation of motions to dismiss: (1) first identifying non-conclusory factual allegations, and (2) determining whether these allegations, taken as true and construed in the light most favorable to the plaintiff, "plausibly give rise to an entitlement to relief." *Id.; Erickson v. Pardus*, 551 U.S. 89 (2007). *Twombly* reaffirmed the holding in *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 508 (2002) that a plaintiff's Title VII complaint need not contain "greater particularity" than what is ordinarily required for assessing the sufficiency of a complaint – thus, the complaint "need not contain specific facts establishing a prima facie case of discrimination.," That is the standard on summary judgment. *Twombly*, 550 U.S. at 544 (2007).

Generally, courts may not consider material outside the complaint when ruling on a motion to dismiss. *Hal Roach Studios, Inc. v. Richard Feiner & Co.,* 896 F.2d 1542, 1555 n. 19 (9th Cir.1990). However, documents specifically identified in the complaint whose authenticity is not questioned by parties may also be considered. *Fecht v. Price Co.,* 70 F.3d 1078, 1080 n. 1 (9th Cir.1995) (superseded by statutes on other grounds). Moreover, the court may consider the full text of those documents, even when the complaint quotes only selected portions. *Id.* It may also consider material properly subject to judicial notice without converting the motion into one for summary judgment. *Barron v. Reich,* 13 F.3d 1370, 1377 (9th Cir.1994). As a general rule, a court freely grants leave to amend a complaint which has been dismissed. FRCP 15(a).

**B.**   **PLAINTIFFS' FIRST CLAIM FOR SEXUAL HARASSMENT AND HOSTILE WORK ENVIRONMENT IS SUFFICIENTLY PLED**

Plaintiffs properly pled that they belonged to a protected class; that they were qualified for

9

their  positions at the Wynn Salon and were performing their job tasks competently; that despite their qualifications, they were treated to an objectively and subjectively sexually offensive and unwelcome work environment, <u>as specifically detailed</u> in their amended complaint. ECF No. 106 at ¶ 94; 277. Last time around,  the Court dismissed the Plaintiffs' sexual harassment claim because the plaintiffs used "impermissible collective pleading in their complaint," and "failed to plead individual facts." ECF No. 81 at p. 8.  That has been corrected in the Second Amended Complaint. Each Judy Doe Plaintiff has set forth exactly what happened to her individually.  *See* ECF No. 106 at ¶¶ 97-274.

Next, "hostile environment" harassment refers to situations where employees work in offensive or abusive environments. *Ellison v. Brady,* 924 F.2d 872, 875 (9th Cir.1991). "Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Meritor Sav. Bank, SFV v. Vinson,* 477 U.S. 57, 65, (1986) (citation omitted).  A hostile environment sexual harassment claim has three elements: (1) the plaintiff must show "he or she was subjected to sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature, (2) that this conduct was unwelcome, and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Ellison,* 924 F.2d at 875–76 (citation omitted). Whether an environment is "hostile" or "abusive" is a matter that "can be determined only by looking at all the circumstances." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23 (1993). "These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id* . "An employer is liable for a hostile environment created by a plaintiff's co-worker if it knew or should have known about the misconduct and failed to take 'prompt and effective remedial action.'" *Westendorf v. W. Coast Contractors of Nev., Inc.,* 712 F.3d 417, 421 (9th Cir.2013) (quoting *E.E.O.C. v. Prospect Airport Servs., Inc.,* 621 F.3d 991, 1001 (9th Cir.2010)).

The Wynn Defendants heavily rely on their claim that the Judy Doe Plaintiffs are only complaining about "discrete acts" of harassment, but that is not so in the hostile work environment sense. ECF No. 115 at p. 7.  Notably, "[h]ostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S.

101, 115, (2002) (citing to 1 B. Lindemann & P. Grossman, Employment Discrimination Law 348–349 (3d ed.1996) ("The repeated nature of the harassment or its intensity constitutes evidence that management knew or should have known of its existence"). The "unlawful employment practice" therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own. 536 U.S. at 115 (2002). *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, (1993) ("As . . . in *Meritor* [*Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67, (1986)] 'mere utterance of an ... epithet which engenders offensive feelings in a[n] employee,' *ibid.* (internal quotation marks omitted), does not sufficiently affect the conditions of employment to implicate Title VII"). Such claims are based on the cumulative effect of individual acts.

The Wynn Defendants pounce on the reprehensible conduct that occurred in 2004, 2008, and 2012-2013, and claim it is "time-barred," but that is missing the point entirely. Those allegations provide the necessary background to explain why, having been  repeatedly being exposed to Steve Wynn's harassment (individually experienced and then hearing that their co-workers suffered the same fate over and over again) made them vulnerable to the corporate attacks taking place in 2018 following media's exposure of Steve Wynn's wrongdoing.  Similarly,  it is inaccurate to claim that their hostile environment claims arising out of providing  "in-room services"  are untimely. The in-room services program was only made non-mandatory in July of 2018, after Wynn Resorts saw the Judy Does Charges which included these claims. Some in-room services allegations involve Steve Wynn himself and fall within the allowed time period, including Judy Doe No. 7's allegation that Wynn management asked her to do a "quickie manicure" for him in February of 2018 [ECF No. 106 at ¶ 226] and Judy Doe No. 6's allegation that she was forced to provide services to Steve Wynn in 2017,  involving "disgusting physical conduct during the manicure that made her extremely uncomfortable." [ECF No. 106 at ¶ 206].  While the Wynn Defendants may argue that the continuing violations doctrine should not apply, that is more appropriate to review on summary judgment – not at this pleading stage.  Further, Wynn Defendants' laches argument from *Grigorescu v. Bd. of Trustees of San Mateo Cty. Cmty. Coll. Dist.*, 2019 WL 4082898, at *4 (N.D. Cal. Aug. 29, 2019) is not applicable. There,  the plaintiff failed to file an administrative charge until 365 days after being

terminated.  That is not the case here. Plaintiffs are all complaining about conduct that occurred in 2018, and the doctrine of laches does not preclude them from including such background information.

Accordingly, the claims for discrimination, harassment, and hostile work environment were all adequately pled and should not be dismissed.

**C.   PLAINTIFFS' SECOND CLAIM FOR RETALIATION WAS SUFFICIENTLY PLED**

Originally, this Court ruled that "[P]laintiffs must cogently allege a causal connection between plaintiffs' protective activity and the adverse employment actions taken against them."  ECF No. 81 at p. 10.  Plaintiffs have done so in  their Second Amended Complaint.

A retaliation claim requires:  (1) involvement in a protected activity, (2) an adverse employment action, and (3) a causal link between the two.  *Stegall v. Citadel Broad Co.*, 350 F.3d 1061, 1065-66 (9th Cir. 2003).  Complaining about harassment is a protected activity under Title VII. *Jurado v. Eleven-Fifty Corp.*, 813 F.2d 1406, 1411 (9th Cir. 1987).  Moreover, "an action is cognizable as an adverse employment action if it is reasonably likely to deter employees from engaging in protected activity."  *Ray v. Henderson*, 217 F.3d 1234 (9th Cir. 2000).  Title VII's retaliation protection is broader than discrimination because retaliation is not limited to employer's actions affecting terms, conditions, or status of employment.  For retaliation, the central question is whether a reasonable employee could be dissuaded from engaging in protected conduct as a result of the employer's actions.  *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 54, (2006).

Here, the Plaintiffs have alleged that after they accessed the EEOC process in March 2018, the EEOC issued notices of unperfected charges, essentially telling the Defendant-employer which of their employees had or were filing formal charges.  Wynn Defendants took no steps to prevent further harm or retaliation to these individuals who had engaged in undeniable protected conduct at that point, and actually <u>retaliated</u> against these Plaintiffs by conducting:

- Two town hall meetings conducted by Steve Wynn protégé and enabler Matt Maddox, on March 14, 2018 and then on May 8, 2018;

- Surprise, forced interviews with Gibson Dunn investigators (Wynn Resorts' Board's choice), arranged by Salon Director Baruk,  understood  to be in constant contact with Steve Wynn, still residing in his private villa at The Wynn (hotel); and

- Continued Salon visits from  executives, attorneys and Board members,, where some

1    questioned Salon employees (including Plaintiffs) about their experiences.

2    ECF No. 106 at ¶ 321. Specifically, after the Plaintiffs "engaged in protected conduct when they

3    accessed the EEOC process, some of the plaintiffs, and others, [they] were then questioned by Wynn

4    Resorts HR personnel about their filings, HR personnel who were perceived as having knowledge of

5    past misconduct and the termination/payoffs to Steve Wynn victims and were employed in an HR

6    department headed by Troy Mitchum, son of Steve Wynn's long-time personal assistant (who booked

7    or called for Plaintiffs and other female employees to provide Steve Wynn services)." *Id.* at ¶ 323.

8         The Wynn Defendants have characterized these retaliatory actions as just "work meetings" is

9    a gross oversimplification of what this looked like to the Plaintiffs and from their perspective. ECF

10   No. 115 at p. 16. Tellingly, they rely on *McCaw v. Potter*, No. 2:04-cv-878-RLH-RJJ, 2006 WL

11   2520328, at *1 (D. Nev. Aug. 29, 2006), a case decided on summary judgment, in arguing that forcing

12   a plaintiff to attend "training sessions" on assaults and threats in the workplace was not severe or

13   pervasive enough to constitute evidence of retaliation. But this case is different, as it involves more

14   than mere "training sessions" but rather pressure from the Wynn Defendants not to speak to the media

15   about any complaints they have, after earlier being ridiculed by their harasser and asked to reveal

16   themselves, to only speak to corporate enablers such as Matt Maddox and the Wynn Resorts Board

17   of Directors, and then to be subjected to continued interrogations from attorneys about their

18   experiences, not as part of any investigation into the Charges of Discrimination, but in a way that

19   reasonably intimidated and scared these Plaintiffs from speaking out. The Wynn Defendants are now

20   claiming that these interrogation tactics were merely "investigation activities," but in light of the

21   reasonable victim standard in viewing the evidence, this is most definitely an issue of fact not to be

22   determined at this stage. ECF No. 115 at p. 17.

23        The Wynn Defendants also allege that a causal connection does not exist, but the temporal

24   proximity between the Plaintiffs accessing the EEOC process and these retaliatory hostile actions

25   from the Wynn Defendants is already circumstantial evidence indicative of a causal showing of

26   retaliation. *See Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054, 1065 (9th Cir.2002) ("[C]ausation

27   can be inferred from timing alone where an adverse employment action follows on the heels

28   of protected activity."). While some of the Judy Doe Plaintiffs may not have contacted the EEOC

1   until after the March 14, 2018 Matt Maddox meeting, that meeting alone is not the only instance of

2   retaliation.  There was also a May 8, 2018 meeting, as well as surprise forced interviews with Gibson

3   Dunn investigators arranged by Steve Wynn-ally and then current Salon Director Claud Baruk, and

4   service visits from Wynn Resorts executives with unnerving inquiries. Plaintiffs should be entitled to

5   present these facts, and themselves testifying to argue that these small incidents  cumulatively created

6   a retaliatory hostile environment.   As such, this claim should not be dismissed at this stage.

7               **D.    PLAINTIFFS' STATE LAW CLAIMS WERE SUFFICIENTLY PROPERLY PLED**

8               The district court dismissed the claim for negligent hiring, training, supervision, and retention,

9   the first time because "the complaint is devoid of allegations to support this claim, such as who the

10  referenced personnel were, how they breached their duty to plaintiffs, or when this occurred."  ECF

11  No. 81 at p. 10. Plaintiffs have now fixed all those deficiencies. (ECF No. 106 at ¶¶ 335-352).

12              Plaintiffs properly pled that the Wynn Defendants owed the Plaintiffs (their employees) a duty

13  to hire, train, supervise and retain "only those individuals who were remained fit and competent to

14  perform their job," ECF No. 106 at ¶ 336.  They failed to do so by "allowing Steve Wynn to control

15  their workplace and by hiring incompetent, unqualified, poorly trained executives and human

16  resources personnel, or by hiring HR personnel who have personal and/or family connections to Steve

17  Wynn."  ECF No. 106 at ¶ 337. The Mass Gaming Commission found that on numerous instances,

18  Wynn Resorts, Ltd CEO Matt Maddox "routinely failed to exercise the proper diligence, express the

19  requisite level of concern, and understands the magnitude of the risk and legal implications associated

20  with much of the information of which he was, or should have been, aware."  ECF No. 106 at ¶ 338.

21              Detailed examples of Defendants' negligent hiring, training, supervision, and retention of

22  management employees includes "the employment of other high-level executives, including but not

23  limited to, Mr. Maddox, General Counsel Kim Sinatra, former presidents Ms. Doreen Whennen, Mr.

24  Mark Schorr, and Mr. Maurice Wooden, and security chief James Stern, who may have been or should

25  have been (a) aware of Steve Wynn's wrongdoing in relation to female employee[s]; (b) aware of,

26  participated in or tolerated the dismissal of employees who may have victimized by Steve Wynn; c)

27  who were or should have been aware of millions of dollars of settlement payments made personally

28  by Steve Wynn to employees (or former employees) who made accusations against Steve Wynn,

1   including for sexual assault, coercion or harassment." ECF No. 106 at ¶ 348.  Further, Plaintiffs pled

2   that the negligent training, supervision and retention of Wynn Defendants' HR staff encompasses

3   "Mr. Mitchum's selection/promotion to HR VP (believed to be by Steve Wynn or with his approval),

4   Mr. Mitchum's lack of qualifications and competence for such a high-level position of responsibility

5   in a major gaming property with thousands of employees, and his relationship (being the son of Cindy

6   Mitchum[,] Steve Wynn's long- time assistant) as having a chilling effect on employees which might

7   keep them from using usual complaint procedures." ECF No. 106 at ¶ 346.

8        The Wynn Defendants assert that this claim is based "exclusively on alleged incidents that

9   occurred prior to September 30, 2017." ECF No. 115 at p. 20.  That is not accurate.  Plaintiffs allege

10  that in "**early 2018** . . . executives (Wooden, Maddox, Sinatra, Mitchum) and Board members [made]

11  public proclamations of support for Steve Wynn (in letters, memos and in meetings) in response to

12  the media reports of his misconduct, including the Wooden and Mulroy letters, and the Board's

13  proclamations upon Steve Wynn's resignation." ECF No. 106 at ¶ 344 (emphasis added).  All nine

14  Judy Doe Plaintiffs have alleged that their managers and HR reps forced them to attend either the

15  January 31, 2018 Wynn Country Club meeting[2], various pre-shift meetings, interviews with the

16  investigators from Wynn's Board of Directors, or subjected  them to corporate memos expressing

17  support for Steve Wynn after the media exposed his misconduct.  *See, e.g.* ECF No. 106 at ¶¶ 107;

18  121; 122; 123; 141; 162; 181; 182; 185; 186; 187; 209; 226; 228; 229; 243; 245; 264; 265.  Judy Doe

19  No. 7 has even alleged that management asked her to do a "quickie manicure" for Steve Wynn at his

20  private villa "about a month after the Wall Street Journal article had been published." ECF No. 106

21  at ¶ 226.  All of these allegations go to the negligent retention hiring, training, retention, and

22  supervision of high-ranking officials (who have all been named) who negligently failed to address

23  Steve Wynn's history of sexually harassing his employees, even <u>after</u> the media exposure in 2018.

24       Plaintiffs provided details of  negligent hiring, training, retention, supervision, and retention

25  events. The  fines imposed by gaming authorities were directed at this very deficiency in Wynn's

26  operation, so it is astounding that Wynn Defendants are even attempting to suggest the court dismiss

27  _____

28  [2] With CEO Matt Maddox now agreeing that allowing Steve Wynn to convene and conduct these meetings might be coercive. **Exhibit 4**: MGC's 4/3/19 Adjudicatory Hearing, pages 243-247.

1    this claim. Tellingly, Wynn Defendants are doing so by relying on a case granting summary judgment

2    for lack of evidence – not at the pleading stage.  *See Cranford v. Underhill*, 2008 WL 2954763, at *7

3    (D. Nev. July 29, 2008) (summary judgment  granted because no evidence that  employer's negligence

4    caused the alleged injury).

5         Wynn Defendants also argue that Plaintiffs have merely "recast[ed] their hostile work

6    environment and retaliation claims as a claim for negligent hiring, training, supervision, and

7    retention," which makes that claim "preempted."  ECF No. 115 at p. 23.  Not so.  Wynn Defendants

8    cite *Brinkman v. Harrah's Oper'g Co., Inc.,*  2008 WL 11389180 (D. Nev. Oct. 16, 2008) in support

9    of their preemption argument, but subsequent rulings have indicated that "in *Brinkman,* the tort claims

10   were based on age discrimination, a subject clearly intended to be remedied by the statutory

11   framework." *Painter v. Atwood*, 912 F. Supp. 2d 962, 965 (D. Nev. 2012).  In *Painter*, the Court

12   reiterated that to the extent the plaintiff's claims "are really based on sexual harassment, this court has

13   already held that tort claims based on sexual harassment are <u>not preempted</u> by NRS chapter 613."

14   *Painter v. Atwood*, 912 F. Supp. 2d 962, 965 (D. Nev. 2012) (emphasis added).  The *Painter* Court

15   cited *Burns v. Mayer,* 175 F.Supp.2d 1259, 1267 (D.Nev.2001), which held that "Most courts,

16   including those of Nevada's sister states of California and Arizona, permit both a sexual harassment

17   claim under state anti-discrimination laws and an emotional distress claim under common law."

18   Further, in *Burns*, the Court clearly stated that it believed "that, if presented with the issue, the Nevada

19   Supreme Court would side with the California and Arizona high courts and find that Nevada's anti-

20   discrimination law also does not preempt common law tort claims." *Id.* at 1267–68.

21        In any event, the negligent hiring, training, supervision, and retention claim does go beyond

22   Plaintiffs' claims for sex discrimination, hostile work environment, and retaliation under NRS

23   613.330.  This claim also involves the decisions by HR representatives (including Troy Mitchum) and

24   by various Wynn executives (including Wooden, Maddox, and Sinatra) to put the Salon employees

25   (including Plaintiffs) at risk by requiring them to perform in-room services for hotel guests, which

26   placed Plaintiffs in dangerous and vulnerable positions.  ECF No. 106 at ¶ 349-350.  This mandate

27   existed up until the summer of 2018. ECF No. 106 at ¶ 140.  Accordingly, this claim is not preempted,

28

1   and even if the preemption theory did apply, Plaintiffs' negligent hiring, training, supervision, and

2   retention claim goes beyond allegations which are those covered by NRS 613.330.

3         Regarding the fourth claim for intentional infliction of emotional distress, the district court

4   originally dismissed this claim because the requisite specificity was missing as to  how the Wynn

5   Defendants "intended or acted with reckless disregard," and how Plaintiffs suffered "severe or

6   extreme emotional distress in a sum in excess of $15,000."  ECF No. 81 at p. 10.  Plaintiffs have

7   provided that specificity in their Second Amended Complaint.   In Nevada, "extreme and outrageous

8   conduct is that which is outside all possible bounds of decency and is regarded as utterly intolerable

9   in a civilized community." *Maduike v. Agency Rent–A–Car,* 114 Nev. 1, 953 P.2d 24, 26

10  (Nev.1998) (internal quotation marks omitted). To see if a plaintiff has sufficiently stated a claim,

11  "The court determines whether the defendant's conduct may be regarded as extreme and outrageous

12  so as to permit recovery, but, where reasonable people may differ, the jury [must determine] whether

13  the conduct was extreme and outrageous enough to result in liability." *Chehade Refai v. Lazaro,* 614

14  F.Supp.2d 1103, 1122 (D.Nev. 2009).

15        Plaintiffs properly pled that after Steve Wynn's years of sexual preying upon employees and

16  corporate cover-up was exposed in the national media, the Wynn Defendants engaged in extreme and

17  outrageous conduct by: using corporate power to deny Steve Wynn's wrongdoing in the workplace

18  and in public proclamations; allowing Steve Wynn and then his successor and protégé Matt Maddox

19  to conduct town hall meetings with Salon employees (including Plaintiffs)  during and after the time

20  that Maddox was personally under investigation by gaming regulators for his failure to rectify the

21  hostile and illegal work environment created by Steve Wynn's misconduct; allowing Steve Wynn to

22  attend a Salon employee birthday party and bring a camera crew, and use this occasion to intimidate

23  Salon employees; and forcing Salon employees to be interviewed on hotel property, with their

24  schedules blocked by Steve Wynn ally and their boss, Claud Baruk. ECF No. 106 at ¶¶ 354-362.

25        Plaintiffs also properly pled that the Wynn Defendants' intent is evidenced by their "failure to

26  actually force Steve Wynn to undergo sexual harassment training; their failure to investigate any of

27  the allegations made regarding sexual harassment; the manner in which they allowed town hall

28  meetings to be conducted while Matt Maddox was being investigated; and the manner in which they

1   allowed Steve Wynn to invade a Salon employee birthday party with a camera crew." ECF No. 106

2   at ¶ 363.  Wynn Defendants attempt to dispute the intent allegations by citing to cases where intent

3   was not found on summary judgment – but that is not where this case is procedurally.  See ECF No.

4   115 at p. 29 (Defendants citing to *Brigance v. Nevada*,  2018 WL 2697393, at *1 (D. Nev. June 5,

5   2018) and *Zermeno v. Stratosphere Corp.,*  2010 WL 2265167, at *1 (D. Nev. June 2, 2010), cases

6   where summary judgment was granted on IIED claims for lack of evidence).

7        Plaintiffs also properly pled that they have suffered severe or extreme emotional distress,

8   which includes physical manifestations of feeling physically sick for having to attend Steve Wynn's

9   January 2018 Wynn Resorts' Country Club Meeting where he demanded that people raise their hands

10  if they had been abused by him (ECF No. 106 at ¶ 161), along with a fear of going into work, and

11  panic episodes (physical manifestations) when having to attend the Wynn Resorts' Country club

12  Meeting (and other meetings) and in being filmed at the February 1, 2018 Salon employee birthday

13  party.  ECF No. 106 at ¶ 364.  This fully satisfied the pleading requirements for an IIED claim.  The

14  despicability of Wynn Defendants' actions  and omissions  directed at Salon employees (including

15  Plaintiffs) becomes more apparent when it is clear that longtime, female Salon employees  were most

16  likely to include those who were Steve Wynn's victims in the past.

17        The Wynn Defendants also argue that the IIED claim precluded by Nevada's worker's

18  compensation statute, Nevada Industrial Insurance Act (NIIA). Wynn Defendants argue that they have

19  immunity from tort liability under NIIA because the alleged injury "arose out of and during the course

20  of employment[,]" and, thus, the tort claims are barred.  ECF No. 115 at p. 24.  Not so.  In *Wood v.*

21  *Safeway, Inc.*, 121 Nev. 724, 121 P.3d 1026, 1032 (2005), the Nevada Supreme Court recognized that

22  "the NIIA does not make an employer absolutely liable and, therefore, absolutely immune from suit

23  for any and all on-the-job injuries suffered by its employees.  Instead, injuries that fall within the

24  ambit of the NIIA's coverage are those that both arise out of the employment <u>and</u> occur within the

25  course  of that employment." (emphasis added).   Additionally, the NIIA does not apply to an

26  employer's intentional torts. *Conway v. Circus Circus Casinos, Inc.*, 8 P.3d 837, 840 (Nev. 2000). To

27  fall within the intentional tort exception, the employee must allege facts in the complaint showing the

28  employer "deliberately and specifically intended" to injure the employee. *Id.*

Here, numerous incidents did not occur within the normal course of the Plaintiffs' employment. Plaintiffs were Wynn and Encore Salon employees, whose normal job duties involved providing salon services (manicures, pedicures, hair and makeup, etc.) to paying customers in the actual Wynn and Encore Salon setting. Their normal job duties do not involve being summoned to the Wynn Country Club, where they were surrounded by security and high-ranking Wynn Resorts, Ltd executives, and ridiculed and interrogated by Steve Wynn as to who among them he abused. Their normal job duties do not involve being forced to attend meetings outside of the Salon where attorneys hired by Wynn Resorts, Ltd questioned them about their experiences as Steve Wynn's victims. Their normal job duties do not involve being filmed in their workplace at a birthday party and being pressured to say nice things about Steve Wynn on camera. These intentional acts are not normal work interactions between the Wynn Defendants and the Judy Doe Plaintiffs, and as such fall outside of NIIA preemption because they describe an intentional tort against these Plaintiffs.

The Wynn Defendants also claim that the IIED claim is "merely a harassment claim with a different title," and is preempted. ECF No. 115, p. 25. This is also disingenuous. As set forth above, tort claims based on sexual harassment are not preempted by NRSC 613. The Plaintiffs alleged facts outside the realm of "harassment" under NRS 613.330. They have alleged intentional extreme and outrageous conduct after Steve Wynn's misconduct was exposed in the media, and was intentionally designed to frighten and intimidate these Judy Doe Plaintiffs from speaking the truth about Steve Wynn's abuse and the facilitating and cover-up of misconduct by the Wynn Defendants. This IIED claim should not be dismissed at this pleading stage.

Tellingly, Wynn Defendants heavily rely on a case decided on appeal following a bench trial to argue that Plaintiffs have not shown enough evidence of extreme and outrageous conduct. Defendants misuse *Olivero v. Lowe*, 116 Nev. 395, 995 P.2d 1023, 1026 (2000), where a defendant's actions were extreme and outrageous when he brandished a gun at the plaintiff, punched him, and pointed a gun at him while threatening to take his life. In other words, Wynn Defendants are arguing that an IIED claim can only exist if a gun is involved and someone's life is threatened. Respectfully, the fact-finder should be the one deciding whether the Wynn Defendants' conduct goes beyond all bounds of human decency – not the Wynn Defendants seeking to escape liability for actions and omissions for which they have been fined

1   over $55 Million in gaming fines by gaming regulators in two states.

2        Regarding the fifth claim for false imprisonment, Judy Doe Nos. 1, 2, 3, 5, and 8 properly pled

3   that the Wynn Defendants summoned them (along with all other on-duty Salon employees) to a

4   mandatory  meeting in a manner that intentionally confined the Plaintiffs within boundaries fixed by

5   Defendants.  Specifically, Defendants' high-level executives, security personnel, and possibly some

6   Board members positioned themselves along the perimeter of the room in such a manner that Plaintiffs

7   reasonably believed they were not allowed to leave.  ECF No. 106 at ¶ 369.  They pled that the Wynn

8   Defendants did so for improper and illegal purposes (to retaliate against those who identified

9   themselves as Steve Wynn's victims), and that they felt intimidated and desired to leave, but felt

10  physically unable to because of the personnel surrounding the perimeter of the room watching

11  everyone.  ECF No. 106 at ¶¶ 370-373.  They were harmed by this confinement, as they were forced

12  to endure being in the same room as their predator Steve Wynn and to listen to him ridicule those who

13  had spoken to the media about his sexual misconduct and who was allowed to demand that they out

14  themselves.  ECF No. 106 at ¶ 375.

15       The Wynn Defendants argue that the false imprisonment claim is "untimely" because it was

16  not specifically set forth in Plaintiffs' First Amended Complaint.  ECF No. 115 at p. 29.  To the

17  contrary, all of these details (underlying predicate facts) were already alleged previously, and as such

18  they "relate back" pursuant to FRCP 15(c)(B), which allows for amendment if a claim arises "out of

19  the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading."

20  *See In re Dean*, 11 B.R. 542, 545 (B.A.P. 9th Cir. 1981), *aff'd*, 687 F.2d 307 (9th Cir. 1982) ("In

21  determining whether an amended cause of action is to relate back, the emphasis is not on the legal

22  theory of the action, but whether the specified conduct of the defendant, upon which the plaintiff is

23  relying to enforce his amended claim, is identifiable with the original claim.").  *See also Martell v.*

24  *Trilogy Ltd.*, 872 F.2d 322, 327 (9th Cir. 1989) (Where an amended pleading seeks only to add new

25  claims to an original pleading, "the district court should ... analyze[ ] the two pleadings to determine

26  whether they share a common core of operative facts sufficient to impart fair notice of the transaction,

27  occurrence, or conduct called into question."

28

1   In this case, the Second Amended Complaint repeats the same "false imprisonment" factual

2   allegations  stated earlier in the First Amended Complaint.  The First Amended Complaint already

3   stated that on January 31, 2018 "Wynn Resorts convened a mandatory meeting for Salon staff at the

4   Wynn Country Club for a personal appearance and statement by Steve Wynn," where Wynn's

5   "security and top executives lined the walls."  ECF No. 7-1 at ¶¶ 35-37.  The Wynn Defendants cannot

6   realistically claim that they were not on notice of these factual allegations and that the Plaintiffs were

7   claiming they were harmed by being forced to attend.  Adding the "false imprisonment" claim is

8   merely conforming the already-alleged facts to an additional legal cause of action.  There is no shock

9   here, and as such this is a classic "relate back" situation.

10   Continuing their pattern, the Wynn Defendants are relying on summary judgment cases  or at

11   the trial stage in arguing that the false imprisonment claim fails. That  is improper.  See *Lerner Shops*

12   *of Nev., Inc. v. Marin*, 83 Nev. 75, 77, 423 P.2d 398, 399 (1967) (decided on appeal following jury

13   verdict); *Miller v. CVS Pharmacy, Inc.*, 779 F. Supp. 2d 683 (E.D. Mich. 2011) (decided on summary

14   judgment); and *Moen v. Las Vegas Int'l Hotel, Inc.*, 90 Nev. 176, 521 P.2d 370 (1974) (decided on

15   summary judgment). The Wynn Defendants also minimize the mandatory Country Club excursion to

16   a "work meeting" but that is not what has been alleged.  Plaintiffs have alleged that because of the

17   presence of security personnel and high-level executives along the perimeter of the walls of the room,

18   they were "consciously confined to the room."  ECF No. 106 at ¶ 373.  This is not about the Plaintiffs

19   simply feeling mentally trapped because they had to attend a meeting or they would get fired.  This is

20   about the Plaintiffs being <u>physically</u> forced and trapped, surrounded by security and high-level Wynn

21   Executives who were lining the walls and preventing them from leaving and forced to listen to sexual

22   predator CEO Steve Wynn harangue those who dare speak out about his wrongdoing.   As such, this

23   claim should not be dismissed at this stage.

24   Regarding the sixth claim for invasion of privacy, this Court originally indicated that the

25   Plaintiffs "failed to allege any specific interaction," and failed to specify whether the 2/1/18 filming

26   incident  "applies to all plaintiffs."  ECF No. 81 at p. 10.  Plaintiffs have corrected that deficiency.

27   Judy Doe Plaintiffs Nos. 5, 8, and 9 are the ones specifically brining this invasion of privacy claim.

28   ECF No. 106 at p. 65.  They are the ones who were personally subjected to the unprecedented 2/1/18

filming incident in the Salon when Steve Wynn and a camera crew visited a birthday party for a Salon employee and invade the privacy of Judy Doe Plaintiff Nos. 5, 8, and 9. ECF No. 106 at ¶ 384. They pled that they had no desire to have their image recorded for Wynn Resorts' use of challenging the truthful media reports about Steve Wynn's misconduct, nor did they want to be cast in a false light by making it seem that they were supporting Steve Wynn and vouching that he had not done the things being reported in the media. ECF No. 106 at ¶¶ 385. They pled that Judy Doe No. 5 specifically was forced to be interviewed on camera (showing her face and disclosing her identity) and pressured to say that Steve Wynn never assaulted or harassed her, which was not true. ECF No. 106 at ¶ 386.

The "when and where" was clearly set forth in the Second Amended Complaint, so the Wynn Defendants' cite to *Flowers v. Carville*, 112 F. Supp. 2d 1202, 1213 (D. Nev. 2000) has no applicability here. Once again, the leading case for Defendants is a summary judgment case – after evidence and testimony had already been presented: *PETA v. Bobby Berosini, Ltd.*, 111 Nev. 615, 895 P.2d 1269 (1995). That case further substantiates why this matter should proceed to discovery: a "court considering whether a particular action is "highly offensive" should consider: 'the degree of intrusion, the context, conduct and circumstances surrounding the intrusion as well as the intruder's motives and objectives, the setting into which he intrudes, and the expectations of those whose privacy is invaded.'" These highly fact-intensive considerations should not be resolved based on the Wynn Defendants' contention of the facts at this pleading stage. The Wynn Defendants also contend that there is no allegation that there was any filming or that the Judy Doe Plaintiffs were put in a false light. This is not accurate. See ECF No. 106 at ¶ 47 ("This coercive filming film put them in a false light by making it seem that they were supporting Steve Wynn and vouching that he had not done the things being reported in the media."). Wynn Defendants also argue Plaintiffs should have been fine with being filmed because they are likely recorded by workplace cameras for security and safety purposes anyway. ECF No. 115 at p. 33. It should go without saying that security and general surveillance are qualitatively different than being forced to go on camera in the Salon (not being held on a casino floor) and say lies to protect the company.

The case law cited by Defendants is distinguishable as well. Defendants cite to *Kemp v. Black*, which involved coworkers having no expectation of privacy when loudly conversing in a

location lacking interior walls.  *Kemp v. Block*, 607 F. Supp. 1262 (D. Nev. 1985).  That does not apply here.  Similarly, *Med. Lab. Mgmt. Consultants v. Am. Broad. Companies, Inc.,* 306 F.3d 806 (9th Cir. 2002) does not apply because that case involved the plaintiff willingly inviting others (including strangers) into the area he was claiming an expectation of solitude or seclusion, which these Plaintiffs did not do so.  Accordingly, whether or not an invasion of privacy was committed should not be determined  at this pleading stage.

### E.   PLAINTIFFS HAVE A PROPER REQUEST FOR INJUNCTIVE RELIEF

The Wynn Defendants argue that the injunctive relief case should be dismissed by relying on an issue of disputed fact: whether they have already made significant changes to "ensure that any failings regarding Mr. Wynn never occur again with respect to Wynn Las Vegas' workplace."  ECF No. 115 at p. 48.  That is not what these Judy Doe Plaintiffs have pled in their Second Amended Complaint.  The Plaintiffs have pled that despite the promises that the Wynn Defendants made to the Mass Gaming Commission, they were still subjected to a hostile work environment, and retaliatory harassment after the media exposed Steve Wynn's wrongdoing.

There is already objective evidence confirming that was the case, with the Mass Gaming Commission finding that despite the abrupt and inferentially guilt-laden departure of wrongdoer Steve Wynn in early Feb 2018, Mass Gaming regulators and their investigation recognized the past misconduct and possible additional ongoing corporate toxicity  when those in charge (Board members, executives and managers) selected, promoted and managed by Steve Wynn for the preceding 12 years remained in place at the top of the organization.

Plaintiffs are specifically requesting that the Wynn Defendants "be required to engage the services of **outside**, independent, highly competent, qualified expert consultants to fully study the workplace culture which led to this injurious and hostile situation and allowed it to fester and continue for so many years, and which, in each Plaintiff's individual opinion, has not been fully remedied." ECF No. 106 at ¶ 400.  Plaintiffs also are requesting that the Wynn Defendants be "required to create and implement an effective anti-harassment and anti-discrimination program, including policies, training (prevention) and complaint procedures which work and do not inflict further damage on victims."  ECF No. 106 at ¶ 401. The Wynn Defendants' main argument for dismissal of this claim is

that they did not "intend to engage in an unlawful employment practice" and they have allegedly already "cured" all of their problems. ECF No. 115 at pp. 35-36. But those are  issues of fact to be determined by a fact-finder, and the allegations in the Second Amended Complaint must, at this stage, be accepted.   This claim should not be dismissed.

### F.   REQUEST FOR LEAVE TO AMEND

In the event the Court determines that there are curable deficiencies in the Judy Doe Plaintiffs' Second Amended Complaint, the Judy Doe Plaintiffs respectfully ask that the Court grant them leave to amend their complaint with additional curative details pursuant to FRCP 15(a).   FRCP 15(a) declares that leave to amend "shall be freely given when justice so requires."   The United States Supreme Court has declared this "mandate is to be heeded" and the Ninth Circuit has ruled that amendment "is to be applied with extreme liberality." *Foman v. Davis*, 371 U.S. 178 (1962); *Owens v. Kaiser Found. Health Plan, Inc*., 244 F.3d 708, 712 (9th Cir. 2001).   Dismissal without leave to amend "is not appropriate unless it is clear, upon de novo review, that the complaint could not be saved by any amendment."   *Chang v. Chen*, 80 F.3d 1293 (9th Cir. 1996).

## IV.   CONCLUSION

Based on the foregoing, this Court should deny Defendant Las Vegas, LLC's motion to dismiss, and Wynn Resorts, Ltd's joinder thereto [ECF Nos. 115 and 119] in their entirety.

DATED this 15th day of April, 2022.

Respectfully submitted,

MAIER GUTIERREZ & ASSOCIATES


 /s/ Danielle J. Barraza
JASON R. MAIER, ESQ., NV Bar No. 8557
JOSEPH A. GUTIERREZ, ESQ., NV Bar No. 9046
DANIELLE J. BARRAZA, ESQ., NV Bar No. 13822
8816 Spanish Ridge Avenue
Las Vegas, Nevada 89148


KATHLEEN J. ENGLAND, ESQ., NV Bar No. 206
GILBERT & ENGLAND LAW FIRM
610 South Ninth Street
Las Vegas, Nevada 89101
*Attorneys for Plaintiffs*

**DECLARATION OF ATTORNEY KATHLEEN J. ENGLAND, ESQ.**

Kathleen J. England, Esq., co-counsel for Plaintiffs, hereby declares the following under the penalties of perjury.  I am making this Declaration for the purpose of authenticating the exhibits attached to Plaintiffs' response in opposition to Wynn Las Vegas, LLC's motion to dismiss [ECF Nos. 8-9]. I obtained these documents from Massachusetts Gaming Commission, a public agency.  **Exhibit 1** is a true and correct copy of January 26, 2018 Memorandum that then-Wynn Las Vegas, LLC. Maurice Wooden issued.  **Exhibit 2** is a true and accurate copy of portions of the Massachusetts Gaming Commission's Investigative Report Regarding Ongoing Suitability of Wynn MA, LLC, dated 3/15/19 and released to the public on April 2, 2019.  **Exhibit 3** is a true and accurate copy of portions of the Massachusetts Gaming Commission's Decision and Order dated April 30, 2019.  **Exhibit 4** is a true and accurate copy of portions of the Massachusetts Gaming Commission's 4/3/2019 Adjudicatory Hearing Transcript.  Exhibits 2, 3, and 4 are admissible public records from this public agency.

Respectfully submitted this 15th day of April 2022:


 __/s/ Kathleen J. England_____

 KATHLEEN J. ENGLAND
 Counsel for Plaintiffs


**EXHIBIT INDEX**

| Exhibit No. | Description |
| --- | --- |
| 1 | January 26, 2018 Memorandum Issued by Maurice Wooden |
| 2 | Massachusetts Gaming Commission's Investigative Report Regarding Ongoing Suitability of Wynn MA, LLC published on 3/15/19 |
| 3 | Massachusetts Gaming Commission's Decision and Order dated April 30, 2019 |
| 4 | Massachusetts Gaming Commission, 4/3/2019 Adjudicatory Hearing Transcript, select pages. |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that on April 15, 2022, I served a true and correct copy of the foregoing: **PLAINTIFFS' OPPOSITION TO DEFENDANT WYNN LAS VEGAS, LLC'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT** through the CM/ECF system of the United States District court for the District of Nevada upon the following:

Deverie J. Christensen, Esq.
Joshua A. Sliker, Esq.
JACKSON LEWIS P.C.
300 S. Fourth Street, Suite 900
Las Vegas, Nevada 89101
*Attorneys for Defendants Wynn Resorts, Limited and Wynn Las Vegas, LLC*


 */s/ Danielle J. Barraza*
An Employee of MAIER GUTIERREZ & ASSOCIATES